[Nos. 27282-9-I; 27443-1-I; Division One. May 11, 1992.]
27559-3-I.

CATHERINA WHEELER, *Respondent,* v. CATHOLIC
ARCHDIOCESE OF SEATTLE, *Appellant.*

554

*Patrick W. Crowley* and *Siderius, Lonergan & Crowley,* for appellant.

*Judith A. Lonnquist* and *Shelley Kostrinsky,* for respondent.

BAKER, J. — The Catholic Archdiocese of Seattle appeals a judgment on a jury verdict in favor of Catherina Wheeler

on her claims of handicap discrimination, retaliation, and negligent supervision. The Archdiocese alleges the trial court erred in: (1) directing a verdict for Wheeler on handicap discrimination; (2) ruling that Wheeler's negligent supervision claim was not barred by the exclusive remedy provision of the Industrial Insurance Act; and (3) refusing to offset her recovery by the amount of workers' compensation benefits she received.

Wheeler filed a separate appeal, alleging the trial court erred in: (1) refusing to order reinstatement; and (2) awarding her insufficient attorney's fees.

## FACTS

Catherina Wheeler was hired in 1979 as head housekeeper of St. Thomas Center (Center), a conference facility owned by the Catholic Archdiocese of Seattle (Archdiocese). In 1981 she was promoted to executive housekeeper and received favorable performance evaluations thereafter. The written job description for the position included only supervisory and managerial duties; it did not include physical cleaning tasks.

In April 1984 the Archdiocese hired Norbert Patton as director of maintenance at the Center. Patton combined the housekeeping and maintenance departments under his supervision. As a result, Wheeler's salaried position became an hourly position. She was told not to attend staff meetings and to report to Patton instead of the Center's administrator, Donald Leak. Patton intimated that she would be replaced. Wheeler complained to Leak about problems she was experiencing with Patton, but Leak told her to communicate directly with Patton about the problems.

In May 1984 Wheeler suffered an industrial injury to her hand. She continued to work for 2 weeks while her assistant was on vacation, then went on medical leave for more than 3 months. Before she went on leave, Patton made some sexually explicit comments to her.

During her leave several significant events occurred. First, she received a memorandum from Leak stating that if

she and Patton did not make progress on their communication problems within the month, her work performance would be considered unsatisfactory. Second, Wheeler's office was closed and she was assigned a corner of Patton's office as her work station. Finally, Patton wrote a memorandum to Leak stating that he (Patton) had told Wheeler she could not return to work without a full work release from her doctor.

Wheeler felt that she was "on [her] way out" and was going to lose her job at the Center. She became despondent and attempted suicide. She spent 3 weeks in an inpatient treatment facility.

She returned to work after the 3-month leave before her hand was completely healed. Patton told Wheeler that the worker assigned to clean restrooms and showers was needed in the maintenance department, so Wheeler would have to perform that work. When she complained to Patton after 2 weeks that this heavy work was difficult because of her injury and should be done by a man, Patton responded that she was making more money than most of the men, so she should be able to do a man's work.

Patton began pointing out to Wheeler doors and windows left open and garbage on floors — all in rooms she had previously cleaned and locked. She repeatedly found excrement smeared on the floors and walls of one of the rest rooms she was assigned to clean. She believed that Patton was responsible for these occurrences. Patton gave her a dismissal warning for having mentioned to a maintenance worker that the Center's building might be sold in a few years, a fact Wheeler alleges was common knowledge.

In October 1984, the month after she returned to work, Wheeler complained to Leak that Patton was incompetent, and she described her problems with Patton. Leak met with both of them and they agreed to resolve some of their differences. Soon after the meeting, however, Wheeler began to receive threatening telephone calls in the middle of the night. The content of the calls caused her to believe that Patton was making them. She reported the calls to Leak

and to the police. Patton continued to make sexually explicit comments to Wheeler at work.

Leak acknowledged that Wheeler complained to him about Patton's use of foul language. He also acknowledged that Wheeler told him about an incident during which Patton made highly inappropriate sexual comments. Wheeler also testified that she told Leak another female employee had been sexually propositioned by Patton.

In November 1984 Patton was fired for neglect of duty and failure to renew his boiler's license. Wheeler testified that Leak asked her to remain at home on the day Patton was fired and told her, "we are doing this for your protection".

The following month, Wheeler reinjured her hand on the same defective mechanism that had caused the original injury. Patton had been assigned to repair the mechanism. Wheeler's arm was placed in a removable cast from January to April 1985. Leak permitted her to continue working in her supervisory capacity.

In January 1985 Patton was reinstated by order of the Archdiocese's personnel board. Upon hearing of the personnel board's decision, Wheeler told Leak she feared Patton because of his actions toward her and because of his description of his violent military and mercenary exploits. She also put in writing the report she had made earlier about Patton propositioning another female employee.

When Patton returned to work he threatened to take revenge on those responsible for his firing. A number of unusual incidents then occurred, including damage to Wheeler's car and several incidents at work which were potentially very dangerous to Wheeler. Wheeler testified concerning circumstances which caused her to believe Patton was responsible for each of these occurrences. Patton was subsequently fired for a second time.

In April 1985 the first of three surgeries was performed on Wheeler's hand. She returned to work 6 weeks later and worked until she underwent the second surgery in September 1985. Wheeler testified that when she left for the second

surgery, Leak assured her there would always be a place for her at the Center and that another employee would fill her position only on a temporary basis.

Eight months later, Wheeler's doctor released her to perform her supervisory responsibilities. She met with Leak concerning resuming work but was told the Center had only been obligated to hold her position for 60 days, and that the position had been filled. Wheeler testified that she was interviewed for a file clerk position at half her previous wages, but was rejected as having a poor attitude when she asked for higher pay. Wheeler was not notified of any other job openings nor offered any other jobs with the Archdiocese.

In early 1987 Wheeler successfully completed a vocational rehabilitation course for work as a hotel desk clerk. However, due to further deterioration of her hand condition, she was unable to pursue that career.

Two lay witnesses testified to the emotional trauma Wheeler suffered as a result of Patton's harassment and the loss of her job. Wheeler's treating psychologist testified that she suffers from posttraumatic stress disorder.

Leak testified that there had been no performance-related reason for placing Wheeler under Patton's supervision. He also testified that Patton had correctly instructed Wheeler in 1984 that she was not to return to work without a full medical release. He admitted that after Wheeler left the Center in September 1985, three job vacancies occurred, and that Wheeler was not notified of any of them. Wheeler presented evidence that she was qualified for each of those positions.

At the close of the evidence, the court granted Wheeler's motion for a directed verdict on handicap discrimination and denied the Archdiocese's motion to dismiss the negligent supervision claim. The court reiterated its pretrial ruling that the Archdiocese would not be entitled to an offset of Wheeler's workers' compensation benefits in the event she was awarded damages.

The jury was instructed on sex, age[1] and handicap discrimination, retaliation for opposing discrimination, negligent supervision/negligent infliction of emotional distress, and outrage. The jury returned a general verdict of $150,000 in favor of Wheeler on the claims of handicap discrimination, retaliation, and negligent supervision/negligent infliction of emotional distress.

The trial court denied the Archdiocese's motion for a new trial and Wheeler's motion for reinstatement. The court entered judgment on the verdict and awarded Wheeler approximately $47,000 in attorney's fees and expenses. The Archdiocese appeals the judgment, Wheeler appeals the denial of reinstatement, and both parties appeal the attorney's fee award. Their appeals have been consolidated.

### DIRECTED VERDICT ON HANDICAP DISCRIMINATION

■ A motion for a directed verdict may be granted only if it can be said, as a matter of law, that no evidence or reasonable inferences existed to sustain a verdict for the party opposing the motion. The evidence must be considered in the light most favorable to the nonmoving party.

*Bender v. Seattle*, 99 Wn.2d 582, 587, 664 P.2d 492 (1983). The motion should be denied if the nonmoving party presents substantial evidence to support a verdict, *i.e.*, evidence that would convince an unprejudiced, thinking mind of the truth of the facts to which the evidence is directed. *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

■ In Washington, it is unlawful to discharge or discriminate against any person in compensation or in other terms or conditions of employment "because of age, sex, marital status, race, creed, color, national origin, or *the presence of any sensory, mental, or physical handicap*[.]" (Italics ours.) RCW 49.60.180(2), (3). The elements of a claim of handicap discrimination are: (1) the plaintiff is handicapped; (2) he or she was qualified to fill a vacant position; and (3) the employer failed to take affirmative measures to make known

---

[1]Evidence presented by Wheeler concerning age discrimination is not included in this factual summary because the evidence was slight and is not relevant to these appeals.

such job opportunities to the plaintiff and to determine whether he or she was in fact qualified for those positions. The third element is known as the employer's duty reasonably to accommodate the handicapped individual. *See Reese v. Sears, Roebuck & Co.*, 107 Wn.2d 563, 579, 731 P.2d 497 (1987), *overruled on other grounds in Phillips v. Seattle*, 111 Wn.2d 903, 766 P.2d 1099 (1989); *Dean v. Municipality of Metro Seattle*, 104 Wn.2d 627, 639, 708 P.2d 393 (1985); WAC 162-22-080(1). Once the plaintiff has established a prima facie case of handicap discrimination, the burden shifts to the employer to demonstrate a nondiscriminatory reason for refusing to accommodate. *Reese*, 107 Wn.2d at 579.

The three job vacancies that Wheeler alleged she was qualified to fill arose subsequent to the termination of her employment with the Archdiocese.[2] The question whether an employer's duty of reasonable accommodation extends beyond the termination of the employer-employee relationship, and how long it extends, has not been directly addressed in Washington case law. However, three Washington Supreme Court decisions provide us with guidance on this question.

In *Dean v. Municipality of Metro Seattle, supra*, a bus driver who suffered vision loss in one eye unsuccessfully applied for several nondriving positions with his employer before resigning in order to collect retirement benefits. He applied for three more such positions after his resignation. Other vacancies arose for which he might have qualified, but he was not notified of them. The Supreme Court affirmed judgment in Dean's favor, stating that Dean produced proof he had applied for five vacant positions with his former employer and was qualified for others about

---

[2]Although Leak asserted that Wheeler's employment was never terminated, the record does not support this assertion. Her last day of work was September 7, 1985. Payroll records indicate she was terminated from the payroll in December 1986. In the spring of 1987 she was permanently replaced and her fringe benefits were terminated.

The first of the three job vacancies at issue here arose when a permanent replacement for Wheeler was sought in the spring of 1987. The second and third vacancies arose in 1987 and 1988.

which he was not informed. *Dean*, 104 Wn.2d at 638-39. It is significant for our purposes that the court did not differentiate between the employer's duty regarding the vacancies which arose *before* Dean's resignation and those which arose *after* it. Furthermore, the court stated that the case did not involve a failure to hire, but rather a failure to reasonably accommodate a handicap which developed while the plaintiff was in the employ of the employer. Thus, the employer's duty toward the handicapped former employee was not merely a duty of nondiscrimination in hiring should the former employee choose to apply, but an affirmative duty to *inform* him of job openings for which he might be qualified. *Dean*, 104 Wn.2d at 637.

The employer's duty of accommodation was likewise seen as continuing beyond the end of the employment relationship in *Clarke v. Shoreline Sch. Dist. 412*, 106 Wn.2d 102, 720 P.2d 793 (1986). In *Clarke*, a teacher's employment was terminated due to teaching deficiencies and a handicap which prevented proper performance of his job. The Supreme Court affirmed the lawfulness of Clarke's discharge against his challenge based on handicap discrimination, holding that the school district had proved Clarke was not qualified for a teaching position. *Clarke*, 106 Wn.2d at 119. However, the court stated in dictum that the school district had an ongoing duty to accommodate Clarke, even after his discharge, by attempting to place him in a *nonteaching* position:

> [W]e believe the Law Against Discrimination, RCW 49.60.180, as interpreted by this court in *Dean* [*v. Municipality of Metro Seattle*, 104 Wn.2d 627, 639, 708 P.2d 393 (1985)], requires the School District to transfer Clarke to a nonteaching position, if such a position exists and Clarke is qualified to perform it. Because Clarke has not yet sought a nonteaching position with the School District, he has established no discrimination under *Dean*. The issue was left unresolved in the hearing officer's decision, and *we conclude it is still open should Clarke choose to seek a nonteaching position.*

(Italics ours.) *Clarke*, 106 Wn.2d at 122. Significantly, the *Clarke* court did not find the employer's duty to a discharged employee was the same duty of nondiscrimination owed to all handicapped applicants for employment. Rather, it found

fully applicable the *Dean* duty to an employee who becomes handicapped on the job — the duty "to take 'affirmative steps to help him find another position.' " *Clarke*, 106 Wn.2d at 120 (quoting *Dean*, 104 Wn.2d at 639).

Finally, in *Phillips v. Seattle, supra*, the City terminated plaintiff's employment for excessive absenteeism caused by alcoholism. *After* he was discharged, he entered an inpatient treatment program and requested that the City hold his position open pending successful completion of the program. The City refused, and Phillips sued claiming handicap discrimination. The Supreme Court affirmed judgment on the jury's verdict for the City. Phillips requested the Supreme Court to determine as a matter of law what type of reasonable accommodation was due an alcoholic employee. The court refused, stating:

> It is a jury question whether the employer's actions constituted a reasonable accommodation or whether the employee's requests would have placed an undue burden on the employer. Phillips requested his job be kept open until he completed an inpatient treatment program. The City refused. *Whether keeping his job open was an undue burden or a reasonable accommodation was a question for the jury and will not be imposed as a matter of law.*

(Italics ours.) *Phillips*, 111 Wn.2d at 911.

We conclude from these three cases, especially from *Phillips*, that the period of time the duty of accommodation continues after termination should not be imposed as a matter of law. Certainly, there is no statutory or regulatory authority indicating that the duty terminates upon termination of the employment relationship or at any particular time thereafter. Rather, it is for the trier of fact to decide at what point continued attempts to accommodate become an undue burden as opposed to a reasonable requirement. WAC 162-22-080(3) sets forth some of the factors the trier of fact should consider in making this determination:

> The cost of accommodating an able handicapped worker will be considered to be an undue hardship on the conduct of the employer's business only if it is unreasonably high in view of *the size of the employer's business, the value of the employee's work, whether the cost can be included in planned remodeling*

*or maintenance, the requirements of other laws and contracts, and other appropriate considerations.*

(Italics ours.) WAC 162-22-080(3).

In the present case, the trial court did not submit the question of reasonable accommodation to the jury. Instead, the court directed a verdict because it found, as a matter of law, that all three elements of Wheeler's handicap discrimination claim had been proved — including the employer's failure to reasonably accommodate. We now turn to an examination of the propriety of the court's ruling as to each element of the claim.

■ The Archdiocese does not contest that Wheeler made a prima facie showing as to each element of her handicap discrimination claim, and we easily conclude that she did. The Archdiocese produced *no evidence* to rebut this prima facie case. First, the Archdiocese produced no credible evidence that Wheeler was not handicapped. Second, the Archdiocese produced no evidence that Wheeler was unqualified for the three vacant positions. Finally, the Archdiocese produced no evidence that it would have been an undue hardship to have made known these vacancies to Wheeler or to have determined whether in fact she was qualified to fill them.

"Once an individual establishes a prima facie case of handicap discrimination, the burden shifts to the employer, who must demonstrate some nondiscriminatory reason for the refusal . . . to accommodate." *Reese*, 107 Wn.2d at 579. Reasonable accommodation would have been a jury question here had the Archdiocese produced evidence that it would have been an undue hardship to inform Wheeler of the vacancies and determine whether she qualified for them, or that it would have been an undue hardship to do so beyond a certain date. Where no evidence or reasonable inferences exist to sustain a verdict for the employer, a plaintiff who has made a prima facie case establishes her claim as a matter of law. *See Bender*, 99 Wn.2d at 587.

■ The Archdiocese argues that Wheeler's receipt of vocational rehabilitation services is evidence of reasonable accommodation. While a vocational rehabilitation statute does

require employer accommodation of successfully rehabilitated workers, it by no means provides that the mere receipt of rehabilitation services constitutes reasonable accommodation. *See* RCW 51.32.095; *Reese*, 107 Wn.2d at 570. Here, Wheeler's vocational rehabilitation consisted of training as a hotel desk clerk, and there is nothing in the record to indicate that the Archdiocese could have employed her in such a position. The duty of reasonable accommodation pertains to job opportunities "within an employer's business", *Clarke*, 106 Wn.2d at 121, not with other employers. Under these facts, we cannot conclude that Wheeler's receipt of vocational rehabilitation services was evidence of reasonable accommodation.

Since the employer here produced no evidence of undue hardship and failed to rebut any of the elements of handicap discrimination, Wheeler was entitled to a directed verdict.

### Negligent Supervision Claim Not Barred
### by IIA Exclusivity

Wheeler sued the Archdiocese for, *inter alia*, negligent supervision of Norbert Patton, whose harassment caused Wheeler emotional distress.[3] "Negligent supervision of an employee is a recognized cause of action." *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 44, 747 P.2d 1124 (1987), *review denied*, 110 Wn.2d 1016 (1988). The Archdiocese contends this claim should have been dismissed because the Industrial Insurance Act (IIA) provides the exclusive remedy for Wheeler's injuries resulting from its alleged negligent supervision. RCW 51.04.010; RCW 51.32.010. The Archdiocese does not challenge the sufficiency of the evidence of negligent supervision.

■ In *McCarthy v. Department of Social & Health Servs.*, 110 Wn.2d 812, 759 P.2d 351 (1988), the court held that

> [b]arring a common law action without providing a substitute remedy under the Act would abrogate the quid pro quo compromise between the employee and the employer. . . .
> . . . .

---

[3]The complaint listed separate claims for negligent supervision and negligent infliction of emotional distress. The trial court recognized that under the facts of this case, these were alternative statements of the same claim.

*. . . Although the Act provides coverage for occupational diseases, it does not provide the exclusive remedy if the work-related disease falls outside the basic coverage of the Act.*

(Citations omitted. Italics ours.) *McCarthy*, 110 Wn.2d at 816-17; *see Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 76, 821 P.2d 18 (1991). Our first question, then, is whether a claim by Wheeler for a mental disability resulting from Patton's harassment would have fallen within the basic coverage of the IIA. To do so, it would have had to be cognizable as either an "injury" or an "occupational disease".

■ An "injury" is defined in the IIA as "a sudden and tangible happening . . . producing an immediate or prompt result[.]" RCW 51.08.100. The harassment suffered by Wheeler did not occur suddenly or have an immediate result; rather, it consisted of a series of actions over a period of more than a year which resulted in increasing fear and depression. It would therefore not qualify as an "injury". *See In re Reid*, Board of Indus. Ins. Appeals Dec. 88 0793 (1989) (cumulative sexual harassment over a period of time is not compensable as an "injury"). *Cf. In re Erickson*, Board of Indus. Ins. Appeals Dec. 65 990 (1985) (suicide caused by 3-week period of harassment by mentally deranged co-worker was "injury").

■ ■ Neither is Wheeler's condition the result of an "occupational disease" as defined in RCW 51.08.140, which provides: " 'Occupational disease' means such disease or infection as arises naturally and proximately out of employment under the mandatory or elective adoption provisions of this title."[4] In *Dennis v. Department of Labor & Indus.*,

---

[4] Wheeler mistakenly relies on RCW 51.08.142, which requires the Department of Labor and Industries to adopt a rule "that claims based on mental conditions or mental disabilities caused by stress do not fall within the definition of occupational disease in RCW 51.08.140."

RCW 51.08.142 was enacted in 1988 and a regulation was promulgated pursuant thereto effective June 24, 1988. WAC 296-14-300. However, the harassment in this case occurred, and Wheeler's mental condition arose, several years prior to 1988. The statute and the regulation promulgated pursuant to it are not retroactive. *Judd v. Department of Labor & Indus.*, 63 Wn. App. 471, 474 n.2, 820 P.2d 62 (1991); *In re Lindstrand*, Board of Indus. Ins. Appeals Dec. 89 1747 (1989). Therefore, we must evaluate Wheeler's potential claim under prior law.

109 Wn.2d 467, 481, 745 P.2d 1295 (1987), the court interpreted the statutory phrase "arises naturally . . . out of employment" as follows:

> The worker, in attempting to satisfy the "naturally" requirement, must show that his or her particular work conditions *more probably caused his or her disease or disease-based disability than conditions in everyday life or all employments in general*; the disease or disease-based disability must be a natural incident of conditions of that worker's *particular* employment. Finally, the conditions causing the disease or disease-based disability must be conditions of *employment*, that is, conditions of the worker's particular occupation as opposed to conditions coincidentally occurring in his or her workplace.

(Some italics ours.) *Dennis*, 109 Wn.2d at 481.

Following *Dennis*, the Board of Industrial Insurance Appeals (Board) has held that mental disabilities caused by sexual harassment do not arise naturally out of employment, because the physical proximity of victim and harasser occurs in the workplace only coincidentally. *In re Reid*, *supra*; *In re Rhoe*, Board of Indus. Ins. Appeals Dec. 87 0918 (1988). In these decisions, the Board has found there was nothing in the victims' particular work conditions which more probably caused their disabilities than conditions in everyday life or all employments in general. *See Dennis*, 109 Wn.2d at 481.

The present case is somewhat distinguishable from the sexual harassment cases cited above. While part of Patton's harassment of Wheeler was sexual in nature, the majority of the instances of harassment — and by far the most egregious ones — were not. Patton's acts appeared aimed at demeaning Wheeler's status as an employee and endangering her. Nevertheless, nothing in the record suggests that Wheeler's particular employment at the Center more probably caused her disability than conditions in all employments in general. The conditions she encountered were not particular to her occupation, but only coincidentally occurred in her work-

---

*See Ashenbrenner v. Department of Labor & Indus.*, 62 Wn.2d 22, 25, 380 P.2d 730 (1963) (the law in effect at the time of injury controls the rights of claimants under the workers' compensation act).

place. *See Dennis*, 109 Wn.2d at 481. They could just as easily have occurred in any other workplace.

We conclude that a hypothetical claim by Wheeler for a mental disability resulting from Patton's harassment would not have been compensable under the IIA either as an injury or an occupational disease, and therefore it fell outside the basic coverage of the act. Her claim for negligent supervision was thus unaffected by the act's exclusive remedy provision. *McCarthy*, 110 Wn.2d at 816-17. The trial court did not err in refusing to dismiss the negligent supervision claim.

The fact that a portion of Wheeler's emotional distress damages resulted from a cause other than Patton's harassment (*i.e.*, handicap discrimination) does not change this result. Patton's harassment, and the Archdiocese's negligent supervision which allowed it to continue, produced an injury of an utterly different type than either Wheeler's physical injury or the Archdiocese's failure to accommodate her handicap. Where "there [are] two distinct injuries rather than one, and . . . the dominant feature of the tort claim was not personal injury but intangible emotional damage", the tort claim should not be barred by the exclusive remedy provision of workers' compensation. 2A A. Larson, *Workmen's Compensation* § 68.34(b), at 13-122 (1987). Wheeler did not receive workers' compensation benefits for her mental condition. The cost of her psychological counseling was paid by health insurance and later in cash when the insurance was terminated. Trial testimony concerning Wheeler's emotional distress focused on the trauma caused by workplace harassment and discrimination — not the original hand injury.

OFFSET OF WORKERS' COMPENSATION BENEFITS

The Archdiocese argues that the judgment in Wheeler's favor should have been offset by the amount of workers' compensation benefits she received. Wheeler argues that those benefits were received from a source collateral to the Archdiocese, so that the trial court correctly refused to reduce her damages by the amount of the benefits. In *Hayes v. Trulock*, 51 Wn. App. 795, 755 P.2d 830, *review denied*,

111 Wn.2d 1015 (1988), we explained the collateral source rule as follows:

> Benefits received by a plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce a defendant's liability for damages. This collateral source rule holds true even if the benefits are payable to the plaintiff because of the defendant's actionable conduct.

*Hayes*, 51 Wn. App. at 803. In *Hayes*, we held that back pay awards to employees in a wrongful discharge action may not be reduced by the amount of unemployment compensation received.

No Washington case has resolved the question whether workers' compensation benefits fall within the collateral source rule in a suit against one's employer.[5] In *Reese*, 107 Wn.2d at 574, the court stated in dictum that if the appellant employees prevail on their handicap discrimination claims, the amount of workers' compensation benefits they received can be deducted from damages wherever necessary to prevent double recovery. In other contexts, our cases have held that medicare payments and disability benefits fall within the collateral source rule, so that a plaintiff's damages may not be reduced by the amount of those payments he or she has received. *Ciminski v. SCI Corp.*, 90 Wn.2d 802, 807, 585 P.2d 1182 (1978) (medicare benefits received by personal injury victim); *Xieng v. Peoples Nat'l Bank*, 63 Wn. App. 572, 585, 821 P.2d 520 (1991) (disability benefits from third party payor provided to plaintiff-employee as part of general employer fringe benefit plan), *review granted*, 119 Wn.2d 1001 (1992).

The federal courts and the National Labor Relations Board (NLRB) have generally held that workers' compensation benefits which represent lost wages may be deducted from back pay awards, but workers' compensation payments for permanent physical disabilities may not, since

---

[5]Wheeler suggests that the applicability of the collateral source rule to workers' compensation benefits was established in *Boeke v. International Paint Co.*, 27 Wn. App. 611, 617, 620 P.2d 103 (1980), *review denied*, 95 Wn.2d 1004 (1981). However, in *Boeke* the defendant conceded applicability of the rule so the question was not decided by the court.

the latter are not compensation for lost wages. *Canova v. NLRB*, 708 F.2d 1498, 1504 (9th Cir. 1983) (employee discharged by employer in violation of National Labor Relations Act suffered industrial injury during interim employment); *American Mfg. Co. v. Local 47, Int'l Bhd. of Teamsters*, 167 N.L.R.B. 520, 522-23, 66 L.R.R.M. 1122, 1125-26 (1967) (same); *Aguinaga v. United Food & Comm'l Workers Int'l Union*, 720 F. Supp. 862, 876 (D. Kan. 1989) (employee suit for breach of union duty of fair representation); *EEOC v. Blue & White Serv. Corp.*, 674 F. Supp. 1579, 1582-83 (D. Minn. 1987) (Title VII). *But see Whatley v. Skaggs Cos.*, 707 F.2d 1129, 1138-39 (10th Cir. 1983) (trial court did not abuse its discretion in refusing to reduce Title VII award by amount of temporary and permanent disability benefits received by employee for on-the-job injury that occurred during interim employment).

We believe this rule to be a sound one. Our decision in *Hayes* is distinguishable because it involved unemployment compensation rather than workers' compensation.[6] Workers' compensation benefits include compensation for lost wages; they literally take the place of damages in a personal injury action against any employer, which damages would include

---

[6]We reject the Archdiocese's argument that it is entitled to an offset of workers' compensation benefits by virtue of RCW 51.24.020 of the IIA, which provides:

If injury results to a worker from the *deliberate intention of his or her employer to produce such injury*, the worker or beneficiary of the worker shall have the privilege to take under this title and also have cause of action against the employer as if this title had not been enacted, *for any damages in excess of compensation and benefits paid or payable under this title.*

(Italics ours.) This statute requires a deliberate intent on the part of the employer to produce the employee's injury. The injury itself, and not merely the act causing the injury, must be intentional. *Foster v. Allsop Automatic, Inc.*, 86 Wn.2d 579, 584, 547 P.2d 856 (1976).

While a violation of the Law Against Discrimination is "a wrongful act intentionally done", *Browning v. Slenderella Sys.*, 54 Wn.2d 440, 446, 341 P.2d 859 (1959), *overruled on other grounds in Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 805 P.2d 800 (1991), the act requires no showing of a specific intent to injure. Nor was there evidence of such an intent in the present case. (This is not to say that a specific intent to injure might not be shown in a discrimination case under some set of facts.) However, we note that since an offset is allowed even to employers who deliberately injure their workers, it would be incongruous not to allow an offset to employers whose liability is based on lesser degrees of culpability.

lost wages. *See* RCW 51.04.010; *Sacred Heart Med. Ctr. v. Carrado*, 92 Wn.2d 631, 635, 600 P.2d 1015 (1979) (IIA is remedial in nature, for purpose of compensating injured workers). By contrast, unemployment compensation is not pay or wages. It constitutes a collateral benefit that workers receive from the State in furtherance of a separate social policy. *See Council 94, Am. Fed'n of Employees v. State*, 475 A.2d 200, 204 (R.I. 1984); *Aguinaga*, 720 F. Supp. at 876; RCW 50.01.010 (purposes of Employment Security Act are to maintain purchasing power and limit social consequences of relief assistance; remedy any widespread unemployment situation and prevent future recurrences; and reduce involuntary unemployment and suffering caused thereby). In the absence of the IIA, employers would be liable for employees' lost wages in tort actions, provided there was a legal basis for imposing liability (*e.g.*, negligence or strict liability). By contrast, in the absence of the Employment Security Act, employers would *not* be liable in tort for the wages of laid-off employees.

In *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 95 L. Ed. 337, 71 S. Ct. 337 (1951), the United States Supreme Court approved an order of the NLRB refusing to deduct unemployment compensation from a back pay award. The court stated that "the payments to the employees *were not made to discharge any liability or obligation of respondent [employer]*, but to carry out a policy of social betterment for the benefit of the entire state." (Italics ours.) *Gullett Gin Co.*, 340 U.S. at 364. While workers' compensation also exists for the betterment of the entire state,[7] its primary purpose, unlike that of unemployment compensation, is "to discharge [a] liability or obligation" of the employer — *i.e.*, the tort liability to injured workers that the employer would otherwise incur. *Gullett Gin Co.*, 340 U.S. at 364.

The distinction drawn here between workers' compensation and unemployment compensation is also found in cases

---

[7]The declaration statement of the IIA, RCW 51.04.010, provides in pertinent part: "The welfare of the state depends upon its industries, and even more upon the welfare of its wage worker."

under the National Labor Relations Act (NLRA). Where a worker is discriminatorily discharged in violation of the NLRA and is subsequently injured while working for another employer, the workers' compensation benefits received for that injury are deducted from the worker's back pay award to the extent those benefits represent compensation for lost wages. *Canova,* 708 F.2d at 1504; *American Mfg. Co. v. Local 47, Int'l Bhd. of Teamsters,* 167 N.L.R.B. at 522-23, 66 L.R.R.M. at 1125-26. By contrast, if the worker receives unemployment compensation after being discriminatorily discharged, the unemployment benefits are not deducted from the worker's back pay award. *Gullett Gin Co.,* 340 U.S. at 364; *Standard Materials, Inc. v. NLRB,* 862 F.2d 1188, 1193 (5th Cir. 1989); *Singer v. Canovali,* 278 N.L.R.B. 902, 904, 122 L.R.R.M. 1124, 1126 (1986).

We hold that the trial court erred by refusing to offset Wheeler's damage award by the amount of her workers' compensation benefits which represents replacement for lost wages.[8] The portion of her workers' compensation that represents payments for medical expenses should not be deducted from damages because past medical expenses were specifically omitted from the jury instruction on the elements of damages. See instruction 24. On remand, the trial court should determine the amount of the offset and adjust the award accordingly.

REINSTATEMENT

The Washington Law Against Discrimination provides that all remedies authorized by the United States Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.,* are available to plaintiffs in actions under the Law Against Discrimination. RCW 49.60.030(2). Title VII provides for the remedy of reinstatement where appropriate. 42 U.S.C. § 2000e-5(g). The remedial provision of the Law Against Discrimination is to be liberally construed in order to encourage private

---

[8]Since the jury instruction on damages included damages for lost future earnings, any time-loss payments received after the judgment was entered should also be deducted from Wheeler's damage award.

enforcement. (*Blair v. WSU*, 108 Wn.2d 558, 570, 740 P.2d 1379 (1987)).

 Wheeler has cited several Title VII cases holding that successful plaintiffs presumptively are entitled to reinstatement, which is a basic element of the "make whole" remedy. *Darnell v. Jasper, Ala.*, 730 F.2d 653, 655 (11th Cir. 1984); *Sowers v. Kemira, Inc.*, 701 F. Supp. 809, 827 (S.D. Ga. 1988). The decision whether to order reinstatement is discretionary with the trial court. *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 268 (10th Cir. 1975). Where plaintiffs are entitled to reinstatement, but a hostile or otherwise unsuitable work environment counsels against it, front pay may be awarded as an alternative. *Sowers*, 701 F. Supp. at 827.

The jury in this case was instructed on front pay as an element of damages for discrimination. The jury returned a general verdict for Wheeler. Wheeler has cited no authority for the proposition that a plaintiff is entitled to reinstatement after the jury has been instructed on front pay and has returned a general verdict. Of course, this situation never arises under Title VII because there is no right to a jury trial under Title VII. *Lehman v. Nakshian*, 453 U.S. 156, 164, 69 L. Ed. 2d 548, 101 S. Ct. 2698, 2703 (1981); *Slack v. Havens*, 522 F.2d 1091, 1094 (9th Cir. 1975).[9]

 Front pay is an *alternative* to reinstatement. *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473 (11th Cir. 1985). Wheeler argued to the trial court that it was obvious from the amount of the jury's verdict, compared with the calculation of economic damages by Wheeler's expert, that the jury's verdict included back pay and emotional distress damages, but not front pay. The trial court, on the other hand, found that the verdict in all likelihood included damages for front pay. "When there is no request by either

---

[9]Our research in federal case law has revealed only one case approving an order of reinstatement in addition to a jury's award of general damages that were presumed to include front pay. *Sethy v. Alameda Co. Water Dist.*, 545 F.2d 1157, 1163 (9th Cir. 1976) (en banc) (42 U.S.C. § 1981). The court in *Sethy* approved the award based on the broad discretion accorded the trial court. Here we hold that the trial court's award was likewise within its discretion.

party during the course of the trial to segregate items in a verdict, the court is without a basis to thereafter dissect the general verdict to determine what part represented what items." *Foster v. Giroux*, 8 Wn. App. 398, 399, 506 P.2d 897 (1973). Thus, neither the trial court nor this court can determine whether the jury's verdict included front pay damages.

Wheeler has not cited any request during the trial for special interrogatories on the appropriateness of reinstatement or front pay. While her proposed jury instruction presented the remedies as alternatives,[10] no special interrogatory was proposed that would have revealed whether the jury chose the front pay alternative. The trial court stated at a posttrial hearing that although reinstatement is an equitable remedy, an advisory interrogatory to the jury on reinstatement would have been appropriate.

The right to request special interrogatories is waived if not made before jury instructions are given. *Hawley v. Mellem*, 66 Wn.2d 765, 771, 405 P.2d 243 (1965). Because Wheeler failed to request a segregated verdict or special interrogatories on the alternatives of reinstatement and front pay, the trial court was without a basis for determining whether the jury's verdict included an award of front pay. Thus, the trial court did not abuse its discretion in refusing to order reinstatement.

## ATTORNEY'S FEES

RCW 49.60.030(2) provides for an award of reasonable attorney's fees and costs to successful plaintiffs. A trial court's determination of attorney's fees will not be reversed absent an abuse of discretion. The trial court abuses its discretion when its exercise of discretion is manifestly

---

[10]An unnumbered plaintiff's proposed instruction stated:

*"If you further find that there is no job to which she could return, or if discrimination has so tainted the work environment that she could not successfully return, then you may also award damages for future lost earnings*; that is, the present cash value of her salary, pension, and other fringe benefits from today forward until the time that plaintiff may reasonably be expected to retire, decreased by any projected future earnings from another employer." (Italics ours.)

unreasonable or based on untenable grounds. *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989).

 The trial court cut the amount of fees for trial time in half primarily because two attorneys attended trial on behalf of Wheeler. We conclude this reduction was an abuse of discretion.

This was a difficult trial involving a number of issues. The record discloses that plaintiff's counsel divided responsibility for issues and witnesses so that each played an active role in the 1½ weeks of trial. Conscientious and competent counsel spend many hours each trial day beyond those hours actually spent in the courtroom. The attorney fee submission in this case demonstrated that level of commitment below by both counsel for plaintiff. The rejection of one-half the trial time claimed because two counsel were involved is not supported by this record. Likewise, the court's reduction of posttrial fees by $4,435.90 and expenses by $1,539.30, without explanation, was arbitrary and an abuse of discretion.

We also note that the court's two-thirds reduction of pretrial preparation fees may have been excessive, although we are not prepared to say it constituted an abuse, given the high degree of discretion vested in the trial court on such matters. The court correctly noted that it was required to segregate those claims on which Wheeler was entitled to fees (handicap discrimination and retaliation for opposing discrimination) from the claim on which she was not entitled to fees (negligent supervision). *See Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 450, 815 P.2d 1362 (1991). The court focused on the fact that much of the evidence at trial concerned harassment by Patton *before* Wheeler complained to Leak about it. The court reasoned that only the harassment *following* Wheeler's complaints was relevant to the retaliation claim. However, Wheeler presented evidence of the initial sex- and age-related harassment partially to demonstrate a basis for the complaint that led to Patton's retaliation. While Wheeler's

counsel acknowledged that discrimination itself need not be proved in order to recover on a claim of retaliation, the plaintiff should be allowed to make some showing of the basis for her complaints without being overly penalized in her attorney's fee award. Moreover, *all* harassment that occurred after Wheeler's complaint to Leak was relevant to retaliation, regardless of whether it concerned a protected status.[11]

We affirm in part, reverse in part, and remand for redetermination of damages and attorney's fees.

WEBSTER, A.C.J., and SCHOLFIELD, J., concur.

Reconsideration denied August 17, 1992.

Review granted at 120 Wn.2d 1011 (1992).

[No. 28484-3-I. Division One. May 11, 1992.]

---

[11]The attorney's fee award should also be reconsidered in light of our decision that damages must be offset by workers' compensation benefits received. One of the factors a trial court may consider in determining whether to adjust a fee award upward or downward is the degree of success achieved. *Hensley v. Eckerhart,* 461 U.S. 424, 434-35, 76 L. Ed. 2d 40, 103 S. Ct. 1933, 1940 (1983).