Joseph E. SHARPE, Jr., an individual, Plaintiff–Appellant,

v.

AMERICAN TELEPHONE & TELEGRAPH COMPANY, a New York corporation, Defendant–Appellee.

No. 93–36097.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1995.

Decided Sept. 21, 1995.

Laurie N. Cromwell, Ragen & Cromwell, Seattle, WA, for plaintiff-appellant.

Ralph Crockett Pond, Lane Powell Spears Lubersky, Seattle, WA, Van H. Cline, San Francisco, CA, for defendant-appellee.

* Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of

Winslow Whitman, Assistant Attorney General, and Lonnie Davis, Seattle, WA, for amici curiae Washington State Human Rights Commission and Governor's Committee On Disability Issues and Employment.

Douglas S. McDowell and Ann Elizabeth Reesman, McGuiness & Williams, Washington, DC, for amicus curiae Equal Employment Advisory Council.

Before: ALARCON and BRUNETTI, Circuit Judges, and KELLEHER,* Senior District Judge.

BRUNETTI, Circuit Judge:

Joseph E. Sharpe appeals from an order of the district court granting summary judgment to his former employer, American Telephone & Telegraph, Co. (AT & T), on his state law claims alleging disability discrimination in violation of Washington Revised Code § 49.60, breach of contract, negligent and intentional infliction of emotional distress, and negligence. Sharpe also appeals various discovery orders of the district court. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS AND PROCEEDINGS BELOW

In 1990, Sharpe was a Systems Consultant (SC) in AT & T's Seattle Major Markets group. SCs in the Major Markets group provide technical backup to Account Executives (AE), who sell AT & T long-distance service directly to large business customers. In late 1990, in response to changing business conditions, AT & T decided to reorganize its sales force in order to increase the number of AEs in its Commercial Markets Group, which services smaller business customers. Accordingly, it decided to transfer approximately 1000 AEs and SCs from various groups within the company to AE positions in the Commercial Markets Group. In

California, sitting by designation.

order to determine who would be transferred, AT & T used a criticality rating system, whereby employees were rated on a scale of 1 to 20 according to the quality of their skills and the importance of their customer relationships. The lowest rated employees were to be transferred. Each SC selected for transfer was given the option of either becoming an AE in Commercial Markets or resigning from the company.

As part of this reorganization, Sharpe's Major Markets branch was directed to achieve a one-to-one ratio of AEs to SCs. Accordingly, of the seventeen SCs in Sharpe's branch, the nine with the lowest ratings were scheduled for transfer. Sharpe received a rating of 7, which was among the nine lowest in the branch. Two SCs in the branch with a rating higher than Sharpe's were also scheduled for transfer.

On January 10, 1991, Sharpe's supervisor informally told him that he would likely be transferred to an AE position. At that time, he told his supervisor that he could not do the AE job because the additional stress of that position would aggravate his frontal lobe epilepsy. The AE position involved "face-to-face" sales with forty percent of the salary dependent upon commission, while his former SC position involved predominantly behind the scenes sales support with only ten percent of the salary dependent upon commission. That same day, Sharpe contacted AT & T's regional Diversity/Affirmative Action group and informed Job Accommodation Specialist Antoinette Pestana of his concern. He faxed to her a letter from his neurologist, Dr. Jean Millican, that stated in pertinent part: "As occupational stress may be a factor in the occurrence of his seizures, I have recommended that he keep job-related stress under control as best he can, and not assume a position with more stressful responsibilities." Sharpe requested that he be allowed to remain an SC rather than becoming an AE.

On January 11, 1991, AT & T officially announced the transfers. The SCs in Sharpe's group who elected transfer rather than resignation began full-time training for the AE position on January 14. However, Sharpe's transfer was put on hold while AT & T's management and medical department more thoroughly evaluated his situation. Dr. Frances Peters, an AT & T physician, contacted Dr. Millican. Dr. Millican reiterated that stress precipitated Sharpe's seizures, and said that Sharpe should not do anything he found stressful. On January 17, an Accommodation Review Committee held a conference call to discuss how to proceed with Sharpe. After that call, a decision was made to begin Sharpe's training at the AE position, while management would attempt to learn more specific information about his limitations, so that AT & T could provide specific accommodations at the new position.

On January 21, Sharpe began training for the AE position. While his seizures had previously been largely controlled by medication, on the first day he experienced over 40 seizures, and over the next six months he continued to experience more seizures than usual. Sharpe's seizures "begin with an aura followed by feelings of fear, depersonalization, a reality shift, and loss of speech." Sharpe's brief, 4. Sharpe complained to his supervisor, but his training was continued. During his training, Sharpe went on one training sales call with his new supervisor, and one with another AE. He never went on a sales call alone. He had difficulty remaining alert at the sales calls, either because of his seizures or because of the increased medication prescribed to control those seizures. His supervisor told him that she expected him to try to do his job, and that if he did not, his employment would be terminated.

On January 31, ten days after he began his AE training, AT & T received a second letter from Sharpe's neurologist which listed some of the essential functions of the AE job as activities Sharpe should avoid, such as "cold calling," performance pressure, and having his compensation at risk. On that day, AT & T removed Sharpe from the AE training. For the next month, AT & T did not require Sharpe to work, and yet continued his full salary and benefits. During that time, AT & T allowed him to use the Seattle office in order to look for another position within AT & T. AT & T provided him with access to ECOS, an on-line list of AT & T jobs. AT & T also provided regional personnel and a

secretary to assist with his search. Sharpe limited his search to three cities and only applied for three programmer positions in Atlanta. When he was not hired for those positions, Accommodation Specialist Pestana requested justifications from the hiring officer for these decisions. She was informed that the other AT & T employees selected were more current in their computer programming skills, and had better experience and education than Sharpe. Sharpe does not deny that he was less qualified than those hired for those jobs.

On March 1, AT & T placed all newly transferred AEs, who until that time had been receiving their previous salary, on a commission salary program. Because he was not selling and therefore would not receive any commission, Sharpe was placed on short term disability leave, which provided full salary and benefits. He continued to search for a new position within AT & T. In April, Sharpe's attorney contacted AT & T. In May, AT & T offered Sharpe his old SC position back. He declined to accept the offer. When his short term disability benefits expired after one year, Sharpe applied for and began receiving long term disability benefits, which he continues to receive today.

In May 1992, Sharpe filed a complaint against AT & T in Washington state court alleging disability discrimination, discharge in violation of public policy, breach of contract, intentional and negligent infliction of emotional distress, and negligence. AT & T removed the matter to federal district court on the basis of diversity of citizenship. See 28 U.S.C. § 1332; 28 U.S.C. § 1441(a). After considerable discovery, the district court ordered Sharpe to submit to a second psychiatric examination and prohibited him from recording the examination or having his physician present.

Before that examination occurred, the district court granted summary judgment against Sharpe on all of his claims. With respect to his disability discrimination claim, the court concluded that no disputed issue of material fact remained as to whether AT & T had reasonably accommodated his epilepsy. In the alternative, the court concluded that ERISA preempted that claim. The court then concluded that because AT & T had not violated Washington's antidiscrimination law, Sharpe could not maintain his claim for discharge in violation of public policy. With respect to his breach of contract claim, the court concluded that no disputed issue of fact remained as to whether statements in AT & T's Equal Employment Opportunity and Affirmative Action Handbook created an enforceable promise. Finally, the court concluded that Washington's Industrial Insurance Act provided the exclusive remedy for Sharpe's alleged tort claims. Sharpe timely appeals the dismissal of each of these claims, with the exception of the discharge in violation of public policy claim, and he also appeals the district court's discovery orders.

## STANDARD OF REVIEW

■ We review the district court's grant of summary judgment de novo. See Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).

## DISABILITY DISCRIMINATION

■ Washington law prohibits an employer from discriminating against an employee on the basis of a disability. See Wash.Rev. Code Ann. § 49.60 (West 1990). That law requires that an employer reasonably accommodate an employee's disability. See Holland v. Boeing Co., 90 Wash.2d 384, 583 P.2d 621, 623 (1978). In this case, we must determine if there remains a genuine issue of material fact as to whether AT & T reasonably accommodated Sharpe's epilepsy when it initiated his training at the AE position, and then soon thereafter allowed him to search for a new position within the company, without requiring him to perform any AE duties.

■ We must first explain the exact focus of our inquiry. Sharpe argues that under Phillips v. City of Seattle, 111 Wash.2d 903, 766 P.2d 1099, 1103 (1989), if the accommodation that he proposed—allowing him to remain at his SC position—would not have imposed an "undue hardship" upon AT & T, then AT & T failed to reasonably accommodate his epilepsy. We reject this contention.

■ The correct focus is whether the accommodation that AT & T actually provided was reasonable. The United States Supreme Court has established, in the context of religious discrimination claims filed under Title VII of the Civil Rights Act of 1964, that

> where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.... [T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.

*Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986). Washington courts look to federal discrimination law to interpret their own discrimination law. *Clarke v. Shoreline School Dist.,* 106 Wash.2d 102 720 P.2d 793, 803 (1986). We believe the Washington Supreme Court would adopt the *Ansonia* analysis for purposes of analyzing disability discrimination claims. *See Barron v. Safeway Stores, Inc.,* 704 F.Supp. 1555, 1567–68 (E.D.Wash. 1988) (holding same); *cf. Clarke,* 720 P.2d at 802 (only exception to Washington's reasonable accommodation requirement is if employer shows accommodation would impose undue hardship).

For us to hold otherwise would contravene clear law established by Washington courts that, "[the antidiscrimination] Act does not require an employer to offer the employee the precise accommodation he or she requests." *Doe v. Boeing Co.,* 121 Wash.2d 8, 846 P.2d 531, 537 (1993) (favorably citing the *Barron* discussion of *Ansonia*); *see also Clarke,* 720 P.2d at 803. If, rather than defending the reasonableness of the accommodation it chose, AT & T were required to prove that Sharpe's proposed accommodation would have imposed an undue burden, Sharpe would effectively be choosing the accommodation, not AT & T.

■ The case relied upon by Sharpe, *Phillips v. City of Seattle,* 766 P.2d 1099, is not to the contrary. In that case, the employer refused to provide *any* accommodation to a disabled employee. *Id.* at 1100. Under those circumstances, "[n]ecessarily, any reasonable accommodation not requiring an undue burden [was] required." *Id.* at 1104. In other words, having refused to accommodate, the employer must show that any reasonable accommodation, including one proposed by the employee, would have imposed an undue burden. *Id.* at 1103–04. In this case, by contrast, AT & T accommodated Sharpe. If that accommodation was reasonable, then AT & T satisfied its legal obligation, and the inquiry is over.

■ We conclude that there is no genuine issue of fact as to whether AT & T reasonably accommodated Sharpe's epilepsy. It is undisputed that Sharpe's original SC position was eliminated as part of a large-scale restructuring of AT & T's sales force. AT & T's duty to reasonably accommodate Sharpe did not include a duty to create a new SC position for him. *See Dean v. Metropolitan Seattle,* 104 Wash.2d 627, 708 P.2d 393, 397 (1985); *Molloy v. City of Bellevue,* 71 Wash. App. 382, 859 P.2d 613, 618 (1993) (employer "had no duty to exempt [employee] from [its] policy or to create a special position within the department for him.").

■ Nor will we second guess AT & T's criticality rating system, which Sharpe has admitted was not intentionally manipulated to discriminate against him. We have long held that discrimination laws are "not intended as a vehicle for general judicial review of business decisions." *Douglas v. Anderson,* 656 F.2d 528, 535 (9th Cir.1981); *see also Odima v. Westin Tucson Hotel Co.,* 991 F.2d 595, 602 (9th Cir.1993). That rating system determined that, according to AT & T's business standards, Sharpe and nine other SCs in his group were less qualified than those who were retained as SCs. AT & T had no duty to displace other more qualified employees in order to accommodate Sharpe. *See Dean,* 708 P.2d at 397.

■ Rather, to fulfill its duty to reasonably accommodate Sharpe, AT & T was required 1) to determine the extent of his disability and how it could be accommodated, 2) to take affirmative steps to inform him of job opportunities within the Company, and 3)

to consider him for and move him into openings for which he was qualified. *See Dean,* 708 P.2d at 400; *Clarke,* 720 P.2d at 804; *Curtis v. Security Bank of Washington,* 69 Wash.App. 12, 847 P.2d 507, 512 (1993). AT & T indisputably fulfilled this duty. With respect to the first requirement, it withheld his transfer for seven days so that it could gather more information concerning the extent of his disability. When the information provided by Sharpe's doctor did not make clear his limitations, AT & T initiated his training and decided to determine during that training what accommodations would be necessary. Ten days after he began training, AT & T received clarification from Sharpe's doctor that he could not perform the essential functions of the AE job, such as cold calling. It immediately removed him from that training.

AT & T also satisfied the second requirement by helping Sharpe search for a new position within the company without requiring him to work and while maintaining his full salary and benefits. It further provided him with access to on-line listings of AT & T jobs, and provided him with a secretary and regional personnel to assist in the search.

As to the third requirement, AT & T considered him for all three positions for which he applied. However, he was not ultimately offered any of those positions because, as he does not dispute, he was not the most qualified candidate. Accommodation Specialist Pestana contacted the hiring managers for those positions to insure that Sharpe had been fairly considered. After several months, AT & T offered him his old position back, but he declined to accept it.

■ Accordingly, there remains no genuine factual dispute concerning whether AT & T fulfilled its duty to reasonably accommodate Sharpe's disability. We affirm the district court's grant of summary judgment in favor of AT & T on his discrimination claim, and therefore need not address whether ERISA preempts that claim.

### BREACH OF CONTRACT

■ Sharpe argues that statements in AT & T's Equal Employment Opportunity and Affirmative Action Handbook made legally enforceable promises respecting how AT & T would accommodate disabled employees. In order to establish an enforceable promise, Sharpe must show that the statements provided specific guarantees of AT & T's conduct in specific situations, *see Swanson v. Liquid Air Corp.,* 118 Wash.2d 512, 826 P.2d 664, 670 (1992); that AT & T offered no conspicuous and effective disclaimer of those guarantees, *see id.* 826 P.2d at 672–73; and that he reasonably relied on those guarantees, *see id.* at 668. These elements usually present questions of fact. However, the district court properly granted summary judgment if a reasonable factfinder could not conclude that all of the elements were fulfilled. *See id.* at 669.

■ Summary judgment was appropriate because AT & T effectively disclaimed all guarantees. In the handbook, it printed a disclaimer reading, "This guide is not a contract of employment.... It should not be interpreted to create any expressed or implied contractual rights between AT & T and any employee...." This was as express a disclaimer as possible. It appeared in the same book as the alleged promise, *see id.* at 673, 676, and it was conspicuous because it appeared on the first page of the handbook. *See id.* Most importantly, Sharpe had notice of the disclaimer: he admitted reading it and annually signing a form acknowledging that he had read it. *See id.* at 673. The district court properly granted summary judgment in favor of AT & T on Sharpe's breach of contract claim.

### TORT LAW CLAIMS

■ Washington's Industrial Insurance Act (Act) provides the exclusive remedy for all on-the-job injuries and occupational diseases covered by the Act. Wash.Rev.Code Ann. § 51.04.010; § 51.32.010 (West 1990). Thus, the Act precludes Sharpe's state tort claims if those claims arise out of an "injury" or "occupational disease" that is compensable under the Act. *See Wheeler v. Catholic Archdiocese of Seattle,* 65 Wash.App. 552, 829 P.2d 196, 203–04 (1992), *rev'd on other grounds,* 124 Wash.2d 634, 880 P.2d 29 (1994).

The Act defines "injury" as "a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result." Wash.Rev.Code Ann. § 51.08.100. Sharpe argues that the aggravation of his epilepsy by the stress of the AE training was not an injury under the Act, because it occurred over a period of ten days. We reject this argument. In *In re David Erickson*, Wash. Bd.Ind.Ins.App. [BIIA], Docket No. 65,990 (1985), the Washington Board of Industrial Insurance Appeals held that a mental condition that resulted from three weeks of clear and intense on-the-job stress was an "injury" compensable under the Act. Interpreting the definition provided above, the Board stated:

> Under the law, the trauma, be it emotional or physical, which is relied upon as the "sudden and tangible happening" must be something "of some notoriety, fixed as to time and susceptible of investigation." *Lehtinen v. Weyerhauser [Weyerhaeuser] Co.*, 63 Wn.2d 456 [387 P.2d 760] (1964). In this case, the trauma was certainly a matter of "some notoriety"; it was certainly "fixed as to time"—from January 6 to January 31, 1982, and [was] "susceptible to investigation".... The trauma here involved was not ill-defined in nature or sustained over an "indefinite" period of time. *Compare Cooper v. Department of Labor and Industries*, 49 W.2d 826 [307 P.2d 272] (1957). Rather, it was very well defined and sustained over a specific three week period of time. Under these circumstances, we hold that the emotional trauma sustained by decedent qualifies as a sudden and tangible happening within the purview of [Wash.Rev.Code] 51.80.100, and that his resulting mental condition constituted an "injury" under the Act.

*Erickson*, BIIA No. 65,990.

 We cannot distinguish Sharpe's case from *Erickson*. The aggravation of his epilepsy produced a substantial increase in seizures on the first day after transfer, was clearly known to those around him, and was sustained over the discrete ten day time period during which he trained for the AE position. Therefore, it was an injury under the Act. *Compare In re Laura Cooper*, BIIA, Docket No. 54,585 (1981) (aggravation of a latent multiple sclerosis condition over several months, culminating during stressful events of one day, is an injury under the Act) *with Wheeler*, 829 P.2d at 204 (fear and depression resulting from harassment suffered over a period more than a year was not an injury under the Act). The district court properly concluded that the Washington Industrial Insurance Act precluded Sharpe's tort law claims.

### DISCOVERY ORDERS

Prior to granting summary judgment in favor of AT & T on all of Sharpe's claims, the district court ordered Sharpe to submit to a second psychiatric examination and prohibited him from recording the examination or having his physician present. Sharpe has not yet submitted to the examination. We need not address his appeal of those orders. Because we affirm the dismissal of all of Sharpe's claims, there will be no trial, and therefore there will be no additional discovery.

### CONCLUSION

The district court properly granted summary judgment against Sharpe on his disability discrimination, breach of contract, and tort law claims.

AFFIRMED.