35 P.3d 1158 (2001)
Michelle SNYDER, Petitioner,
v.
MEDICAL SERVICE CORPORATION OF EASTERN WASHINGTON, Respondent.
No. 69091-0.
Supreme Court of Washington, En Banc.
December 13, 2001.
*1160 Keating, Bucklin, McCormack, Jayne Lyn Freeman, Seattle, Amicus Curiae on Behalf of Washington Defense Trial Lawyers.
Riddell, Williams, Karen F. Jones, Caitlin J. Moughon, Seattle, Amicus Curiae on Behalf of Association of Washington Business.
Anne I. Seidel, Attorney at Law, Jeffrey Lowell Needle, Attorney at Law, Seattle, Amicus Curiae on Behalf of Washington Employment Lawyers Assoc.
Deborah A. Dorfman, Attorney at Law, Seattle, Amicus Curiae on Behalf of Medical Service Corp. of Eastern Wa.
Powell, Kuznetz & Parker, William J. Powell, Spokane, Counsel for Petitioner.
Allen & McLane, Keller Wayne Allen, Spokane, Janet Elaine McKinnon, Attorney at Law, Seattle, Counsel for Respondent.
*1159 SANDERS, J.
We review a Court of Appeals decision affirming summary dismissal of Michelle Snyder's civil suit against her employer, Medical Service Corporation of Eastern Washington.
Snyder presents four issues for review. First, she argues her original action presented a cognizable claim for constructive discharge. Second, she claims Medical Service Corporation failed to make a reasonable accommodation for her mental disability. Third, she claims she made a prima facie case for the tort of outrage. Fourth, and finally, she claims she presented a prima facie case for the tort of negligent infliction of emotional distress. We respond to each assertion in the negative and affirm the trial court's dismissal, as well as the Court of Appeals which affirmed that dismissal.

FACTS
Pursuant to the summary judgment standard we state the facts in the light most favorable to the appellant Snyder. Michelle Snyder began working as a case manager for Medical Service Corporation of Eastern Washington (MSC) in January 1996. A few months later Celestine Hall was hired as her supervisor.
Shortly thereafter several persons resigned from MSC citing Ms. Hall as the reason for their departure. Ms. Hall is apparently an imposing and physically intimidating figure who, it is claimed, uses her size to terrorize those around her. Employees describe her as an "authoritarian," "belligerent," and "harassing-type supervisor" who routinely embarrasses her subordinates in front of their peers.
As Ms. Snyder took on more and more workplace responsibility she frequently discussed with Ms. Hall the possibility of having her salary increased. In May 1996 Ms. Snyder was given a raise as well as an admonition from Ms. Hall. She was told if she sought a further increase in salary she would be disciplined. Nevertheless when Snyder filled out her supervisor evaluation form in July 1996, she described Ms. Hall as wonderful, understanding, and not "out of line."
*1161 In February of the following year Ms. Hall told Ms. Snyder she would receive another raise, but Ms. Hall also warned she would literally hunt Ms. Snyder down and "kill her" if she told anyone at MSC about that raise.
The events which form the basis of this litigation occurred on February 13, 1997. On that day Ms. Hall convened a staff meeting at which she proposed a "push-day" where all employees would come in and work on a Saturday without extra compensation. Ms. Snyder objected, stating she was expecting to spend the weekend with her children. Ms. Hall mocked her in front of the group and Ms. Snyder left the meeting.
After the meeting Ms. Hall confronted Ms. Snyder. She poked Ms. Snyder in the chest and accused her of being insubordinate. That afternoon Ms. Snyder went to see her therapist and did not return to the office. Her doctor advised her to take two weeks off of work. On February 26, 1997, MSC was advised Ms. Snyder would be out of the office for an additional two weeks.
During the second week in March Ms. Snyder met with Dr. Norman Charney, Ms. Hall's supervisor. Snyder told Dr. Charney she suffered from post-traumatic stress disorder. This was the first time MSC was made aware of her condition. Ms. Snyder indicated she could no longer work under Ms. Hall and asked Dr. Charney if she could either report directly to him or be transferred to another department. Dr. Charney stated he would like to have Ms. Snyder back in the office but that she would have to report to Ms. Hall as Hall was still the manager of Snyder's department, and he said he had not yet determined whether disciplinary action should be taken against Hall.
On April 10, 1997, Ms. Snyder took a full time position with another company. She did not return to MSC claiming she could not, and her physician would not allow her to, work under Ms. Hall's supervision.
Snyder filed suit against MSC alleging handicap discrimination, constructive discharge, outrage, and negligent infliction of emotional distress. MSC then moved for summary judgment of dismissal. The motion was granted. Snyder appealed, Division Three affirmed. We granted review.

ANALYSIS

I. CONSTRUCTIVE DISCHARGE
Snyder claims she was constructively discharged from her position when MSC created an intolerable working environment. She further asserts the lower court erred when it dismissed her constructive discharge claim. We disagree. Washington law does not recognize a cause of action for constructive discharge; rather the law recognizes an action for wrongful discharge which may be either express or constructive. Riccobono v. Pierce County, 92 Wash.App. 254, 263, 966 P.2d 327 (1998).
The general rule in Washington is "an employer has the right to discharge an employee, with or without cause, in the absence of a contract for a specified period of time." Roberts v. Atl. Richfield Co., 88 Wash.2d 887, 891, 568 P.2d 764 (1977) (citing Webster v. Schauble, 65 Wash.2d 849, 400 P.2d 292 (1965)). We recognize an exception to the terminable-at-will doctrine by permitting a cause of action for wrongful discharge only "where the discharge contravenes a `clear mandate of public policy.'" Roberts v. Dudley, 140 Wash.2d 58, 63, 993 P.2d 901 (2000) (quoting Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984)).
To avail herself of this narrow exception to the terminable-at-will doctrine Snyder "must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened." Thompson, 102 Wash.2d at 232, 685 P.2d 1081. Because Snyder does not assert her constructive discharge contravened a recognized public policy, she has failed to state a claim for which relief may be granted. This claim was therefore properly dismissed on summary judgment.

II. DISABILITY DISCRIMINATION
Snyder asserts it was error to dismiss her handicap discrimination claim because MSC failed to meet its obligation to accommodate her disability. Employers do *1162 have an affirmative obligation to reasonably accommodate the sensory, mental, or physical limitations of disabled employees unless the accommodation can be shown to impose an undue hardship on the employer's business. Doe v. Boeing Co., 121 Wash.2d 8, 846 P.2d 531 (1993). But the duty to reasonably accommodate an employee's handicap does not arise until the employee makes the employer aware of the disability. Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 643, 9 P.3d 787 (2000). See also Goodman v. Boeing Co., 127 Wash.2d 401, 408, 899 P.2d 1265 (1995) (citing Holland v. Boeing Co., 90 Wash.2d 384, 391, 583 P.2d 621 (1978); accord Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12112(b)(5)(A) (Supp. V 1994) (requiring reasonable accommodation for "known" disabilities)).
As of February 1997 Ms. Snyder had applied for, and been rejected for, three open positions within MSC. But Snyder did not make her employer aware of her alleged disability until March 11, 1997, and within a month she accepted a permanent position with another company. Thus the denial of her prior requests for transfer cannot support a handicap discrimination claim based on failure to accommodate because as of March 11, 1997, MSC had no duty to accommodate.
We have previously held a prima facie case for handicap discrimination requires a plaintiff to prove (1) she is handicapped, (2) she is qualified to fill a vacant position, and (3) the employer failed to take affirmative measures to make such opportunities known to her and to determine whether she is in fact qualified. Dean v. Municipality of Metro. Seattle, 104 Wash.2d 627, 639, 708 P.2d 393 (1985). See also Staub v. Boeing Co., 919 F.Supp. 366, 370 (W.D.Wash.1996) (citing Wheeler v. Catholic Archdiocese, 65 Wash.App. 552, 560-61, 829 P.2d 196 (1992), rev'd on other grounds, 124 Wash.2d 634, 880 P.2d 29 (1994)); Curtis v. Sec. Bank, 69 Wash.App. 12, 17, 847 P.2d 507 (1993).
Similarly when seeking reassignment as an accommodation "the employee must prove that he or she was qualified to fill a vacant position, and that the employer failed to take affirmative measures to make such job opportunity known to the employee and to determine whether the employee was in fact qualified for such position." Pulcino, 141 Wash.2d at 643-44, 9 P.3d 787. Snyder asserts when she spoke to Dr. Charney in March 1997 one of the positions for which she had previously applied was still open. But this is immaterial; she had already been considered for the position and the determination had been made that she did not qualify.
Because Snyder did not inform MSC of her disability prior to seeking a transfer to another position in the company, no duty to accommodate that disability ever arose. Further, even if a duty to accommodate had arisen, Snyder has not shown MSC failed to consider her for a position for which she was in fact qualified. Nor does she point to any case under Washington's law against discrimination (WLAD), chapter 49.60 RCW, or the ADA where an employer was required to provide an employee with a new supervisor as a reasonable accommodation to a disability
As the Court of Appeals correctly noted, no Washington case has addressed whether refusal to provide a new supervisor violates WLAD. However several of the United States courts of appeals have found there is no duty under the ADA to provide an employee with a new supervisor as reasonable accommodation. For example, in Weiler v. Household Fin. Corp., 101 F.3d 519 (7th Cir.1996) Sherry Weiler asserted she could perform the essential functions of her job, but not while she was working under her current supervisor. Weiler, 101 F.3d at 525. The Seventh Circuit rejected Weiler's claim holding, "If Weiler can do the same job for another supervisor, she can do the job, and does not qualify under the ADA." Id. at 525. The court further held that the ADA did not require Weiler's employer to transfer Weiler or her supervisor as an accommodation. Id. at 526. Similarly, in the instant case Snyder claims she could continue to perform the essential functions of her position so long as she did not have to report to Ms. Hall. However if Snyder can perform the job, then she has no disability requiring accommodation *1163 simply because she has a personality conflict with her supervisor.
Other courts have also held that the duty to reasonably accommodate a disability under the ADA does not extend so far as to require an employer to provide an employee with a new supervisor. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319 n. 10 (3d Cir.1999) ("We would hasten to add that a disabled employee is not entitled to a supervisor ideally suited to his or her needs."); Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir.1998) (holding a request to be transferred away from individuals causing an employee stress is unreasonable as a matter of law under the ADA and its New Jersey counterpart); Palmer v. Circuit Court of Cook County, 905 F.Supp. 499, 507 (N.D.Ill. 1995) (holding a personality conflict with a supervisor is not a disability under the ADA, "`A disability is a part of someone and goes with her to her next job. A personality conflict, on the other hand, is specific to an individual....'" (quoting Weiler v. Household Fin. Corp., 1995 WL 452977, at *5)), aff'd, 117 F.3d 351 (7th Cir.1997).
We find these cases persuasive and conclude that there is no duty under WLAD to reasonably accommodate an employee's disability by providing her with a new supervisor. Consequently the dismissal of Snyder's handicap discrimination claim was proper.

III. OUTRAGE
To state a claim for the tort of outrage a plaintiff must show "`"(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress."'" Birklid v. Boeing Co., 127 Wash.2d 853, 867, 904 P.2d 278 (1995) (quoting Dicomes v. State, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (quoting Rice v. Janovich, 109 Wash.2d 48, 61, 742 P.2d 1230 (1987))). Moreover "`[t]he conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."'" Birklid, 127 Wash.2d at 867, 904 P.2d 278 (quoting Dicomes, 113 Wash.2d at 630, 782 P.2d 1002) (quoting Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975))).
Snyder's claim for outrage may have been able to survive a summary judgment challenge had she brought suit against Ms. Hall personally, as the determination of whether conduct is sufficiently outrageous to warrant recovery is generally a question of fact for the jury. Birklid, 127 Wash.2d at 867, 904 P.2d 278 (quoting Dicomes, 113 Wash.2d at 630, 782 P.2d 1002).
However Snyder's outrage claim was against MSC, not Ms. Hall, and consequently it must fail. Niece v. Elmview Group Home, 79 Wash.App. 660, 664, 904 P.2d 784 (1995) noted, "When an employee's intentionally tortious or criminal acts are not in furtherance of the employer's business, the employer is not liable as a matter of law, even if the employment situation provided the opportunity or means for the employee's wrongful acts." Id. at 664, 904 P.2d 784 (citing Bratton v. Calkins, 73 Wash.App. 492, 498, 870 P.2d 981 (1994); Kuehn v. White, 24 Wash.App. 274, 278, 600 P.2d 679 (1979)). We affirmed Niece holding, "[C]urrent Washington law clearly rejects vicarious liability for intentional or criminal conduct outside the scope of employment." Niece, 131 Wash.2d at 56, 929 P.2d 420. MSC forbids its supervisors to use physical force or threats of physical force.
MSC is not liable, as a matter of law, for the intentional torts committed by Ms. Hall acting outside the scope of her employment. Consequently Snyder's claim for outrage was properly dismissed on summary judgment as well.

IV. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
Finally, Snyder asserts she has presented a cognizable claim for negligent infliction of emotional distress, and the trial court erred when it dismissed it.
We reexamined liability for negligent infliction of emotional distress in Hunsley v. Giard, 87 Wash.2d 424, 433, 553 P.2d 1096 (1976). There we held a cause of action *1164 for same does exist in Washington but cautioned: "Not every act which causes harm results in legal liability." Id. at 434, 553 P.2d 1096. As with any claim sounding in negligence, where a plaintiff brings suit based on negligent infliction of emotional distress "we test the plaintiff's negligence claim against the established concepts of duty, breach, proximate cause, and damage or injury." Id. at 434, 553 P.2d 1096.
"The existence of a duty is a question of law and depends on mixed considerations of `logic, common sense, justice, policy, and precedent.'" Lords v. N. Auto. Corp., 75 Wash.App. 589, 596, 881 P.2d 256 (1994) (quoting Hartley v. State, 103 Wash.2d 768, 779, 698 P.2d 77 (1985)). Snyder fails to clearly articulate what duty she would have us impose on her employer. There is no duty for an employer to provide employees with a stress free workplace.
As Division Three of the Court of Appeals observed in Bishop v. State, 77 Wash.App. 228, 233 n. 5, 889 P.2d 959 (1995), "Since Hunsley, courts have recognized the limitations of direct actions for negligent infliction of emotional distress." (citing Calhoun v. Liberty N.W. Ins. Corp., 789 F.Supp. 1540, 1548 (W.D.Wash.1992) (routine discharge for poor work performance does not give rise to cause of action for negligent infliction of emotional distress); Lords, 75 Wash.App. at 595, 881 P.2d 256 (absent "a clear mandate of public policy," an employee has no cause of action against employer for negligent infliction of emotional distress when employment at will is terminated)). We believe Bishop correctly articulates the law in this state: "[A]bsent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." Bishop, 77 Wash.App. at 234-35, 889 P.2d 959. See also Johnson v. Dep't of Soc. & Health Servs., 80 Wash.App. 212, 907 P.2d 1223 (1996) (holding employers have no duty to avoid infliction of emotional distress on employees when responding to employment disputes).
Other jurisdictions have found the tort of negligent infliction of emotional distress does not exist in the employment context or, if it does, it is severely limited. See Antalis v. Ohio Dep't of Commerce, 68 Ohio App.3d 650, 589 N.E.2d 429, 431 (1990) ("Ohio courts have not recognized a separate tort for negligent infliction of emotional distress in employment situations."); Herman v. United Bhd. of Carpenters & Joiners, 60 F.3d 1375 (9th Cir.1995) (Nevada law precludes emotional distress claims in the employment context.); Tischmann v. ITT/Sheraton Corp., 882 F.Supp. 1358 (S.D.N.Y.1995) (New York law does not permit a former employee to utilize claims for intentional or negligent infliction of emotional distress to avoid the employment at will doctrine.); Armstrong v. Paoli Mem'l Hosp., 430 Pa.Super. 36, 633 A.2d 605 (1993) (Pennsylvania recognizes negligent infliction of emotional distress only where the plaintiff is a bystander or where the defendant has a contractual or fiduciary duty.); Parsons v. United Techs. Corp., 243 Conn. 66, 88-89, 700 A.2d 655, 667 (1997) ("[N]egligent infliction of emotional distress in the employment context arises only where it is `based upon unreasonable conduct of the defendant in the termination process.'" (quoting Morris v. Hartford Courant Co., 200 Conn. 676, 682, 513 A.2d 66 (1986))).
In Hunsley we observed, "Our experience tells us that mental distress is a fact of life." Hunsley, 87 Wash.2d at 435, 553 P.2d 1096. Further, we held actions predicated on mental distress, like actions predicated on products liability or medical malpractice, must be subject to limitations imposed by the courts. Id.
To set such limitations we stated "`the defendant's obligation to refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous.'" Hunsley, 87 Wash.2d at 436, 553 P.2d 1096 (emphasis added) (quoting Rodrigues v. State, 52 Haw. 156, 174, 472 P.2d 509 (1970)).
"Conduct is unreasonably dangerous when its risks outweigh its utility." Bishop, 77 Wash.App. at 234, 889 P.2d 959 (citing Wells v. City of Vancouver, 77 Wash.2d 800, *1165 810 n. 3, 467 P.2d 292 (1970)). As Division One of the Court of Appeals observed in Bishop:
The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace.
Id. (footnote omitted).
Snyder claims dismissal of her negligent infliction claim creates a conflict with Chea v. Men's Wearhouse, Inc., 85 Wash.App. 405, 932 P.2d 1261 (1997). In Chea Division One upheld a negligent infliction verdict where a supervisor inflicted emotional damage on an employee. Chea is however limited by its facts.
The Chea court specifically recognized, and concurred with, precedent that an employer's disciplinary decisions in response to a workplace personality dispute will not give rise to a negligent infliction claim. Chea, 85 Wash. App. at 413, 932 P.2d 1261 (citing Bishop, 77 Wash.App. at 235, 889 P.2d 959). Notwithstanding, the Chea court permitted the employee to recover because the employer did not argue at trial the incident at issue was a disciplinary act or in response to a personality dispute. Chea, 85 Wash.App. at 413, 932 P.2d 1261. In contrast, the trial court in the instant matter did find MSC defended on the basis that Snyder's claim encompassed a workplace dispute or personality difference. Consequently Snyder's reliance on Chea is misplaced.

CONCLUSION
For the foregoing reasons we affirm the trial court dismissal as well as the Court of Appeals opinion which affirmed it. Medical Services Corporation of Eastern Washington shall recover its costs on appeal.
SMITH, MADSEN, BRIDGE, JJ., and GUY, J. Pro Tem., concur.
IRELAND, J. (dissenting).
I concur with the majority that Michelle Snyder has not stated a cognizable claim for constructive discharge and that the summary dismissal of this claim should be affirmed. However, when considering the evidence and reasonable inferences therefrom in the light most favorable to Snyder, there are genuine issues of material fact as to her claims for intentional and negligent infliction of emotional distress and for failure to accommodate her mental disability. The summary dismissal of these claims should be reversed, and the case should be remanded for trial on the merits. Therefore, I dissent.

FACTS
Michelle Snyder was hired by Medical Service Corporation (MSC), a health care insurance organization, as a case manager in January 1996. About four months after Snyder began work at MSC, Celestine Hall was hired to supervise the department. Hall, who was more than six feet tall and weighed 300 pounds, was physically intimidating to Snyder. Another MSC employee gave the following description of working conditions after Hall's arrival:
From the time Celestine Hall became our supervisor, great tension and stress resulted. Celestine Hall was authoritarian, belligerent, and in everyone's face. She would approach people at their desks and tower over them in a threatening manner. She was a large person and was physically intimidating. When she wanted the attention of a professional in the department, she spoke louder and louder, and more rapidly, raising her level of agitation to the point where the person she was addressing and those nearby were all upset.
Clerk's Papers (CP) at 145.
Several employeesincluding three nurses and a social worker in the department terminated their employment with MSC, citing Hall's conduct as the reason for their resignations.
After a staff meeting on February 13, 1997, Hall confronted Snyder, poked her in *1166 the chest, and accused her of being insubordinate. Following this encounter, Snyder described herself as hysterical, crying, shaking, and extremely upset.
Snyder was given medication for her distress on the day of the encounter, and she took two weeks off work on the advice of her doctor. On February 26, Snyder's physician informed MSC that she was not ready to return, and it was recommended that she remain off work for another two weeks.
On March 11, Snyder met with Dr. Norman Charney, medical director at MSC and Hall's supervisor. Snyder explained that she had been diagnosed with posttraumatic stress disorder (PTSD) in 1987 or 1988. Snyder had received psychological counseling since 1986, and she had taken antidepressants since 1988.
Snyder informed Charney of the hostile and intimidating work environment she had been subjected to at MSC. She specifically requested that she be provided an opportunity to continue to work for MSCin the same or another positionbut not under Hall's supervision. Charney told Snyder that he wanted her to return to work, but that she would be required to report to Hall. MSC did not place Snyder in a different position or allow her to report to another supervisor.
On April 10, Snyder was offered employment by another company if her physician released her to work. Her physician did release her to work without restriction, but did not release her to return to work under Hall's supervision. Snyder submitted her resignation to MSC because she could not work with Hall. She began work for her new employer on May 1, 1997.

EMPLOYER LIABILITY
"Vicarious liability, otherwise known as the doctrine of respondeat superior, imposes liability on an employer for the torts of an employee who is acting on the employer's behalf." Niece v. Elmview Group Home, 131 Wash.2d 39, 48, 929 P.2d 420 (1997).
"Generally, in order to hold an employer vicariously liable for the tortious acts of its employees, it must be established that the employee was acting in furtherance of the employer's business and within the course and scope of employment when the tortious act was committed." Henderson v. Pennwalt Corp., 41 Wash.App. 547, 552, 704 P.2d 1256 (1985). Whether an employee's tortious act was performed within the scope of his or her employment "is a determination which necessarily depends upon the particular circumstances and facts of the case." Kuehn v. White, 24 Wash.App. 274, 280, 600 P.2d 679 (1979).
"Normally, whether a supervisory employee acts within the scope of employment is a jury question...." Mason v. Kenyon Zero Storage, 71 Wash.App. 5, 12, 856 P.2d 410 (1993). Whether a particular act falls within the scope of the supervisor's employment depends on proof of the employer's express direction, or on facts and circumstances that imply direction or authority. De Leon v. Doyhof Fish Prods. Co., 104 Wash. 337, 340, 176 P. 355 (1918).
The De Leon court focused on torts inflicted by a supervisory employee on a subordinate employee:
[W]here the [employer] has given a [supervisor] a general authority, and in the exercise of that authority the [supervisor] negligently or maliciously injures another, the act complained of was done in the course of his employment, and,
"the [employer] .... will be deemed to have consented to and authorized the act of the [supervisor], and he will not be excused from liability, although the [supervisor] abused his authority, or was reckless in the performance of his duty, and inflicted an unnecessary injury in executing his [employer's] orders. The [employer] who puts the [supervisor] in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the [supervisor], through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury upon *1167 another."[1]
Id. at 342, 176 P. 355 (quoting Rounds v. Del., Lackawanna & W. R.R., 64 N.Y. 129 (1876)).[2]
Here, Snyder presented evidence that although MSC's management had been given repeated notice of Hall's abusive conduct, the employer failed to take action. This supports an inference that Hall was implicitly authorized to maintain discipline in this manner, and thus was acting within the scope of her employment and in furtherance of her employer's business.
MSC, on the other hand, offered the following statement in an affidavit by Charney: "No supervisor of MSC is authorized to use physical force or threats in carrying out their duties on behalf of MSC. Any use of physical force or threats by a supervisor or any employee of MSC is outside the scope of their authority." CP at 219.
Given the record before the trial court on the motion for summary judgment, there is a genuine issue of material fact as to whether Hall was acting on her employer's behalf so as to subject MSC to liability for her conduct. As a threshold matter, the jury must find that Hall was acting on MSC's behalf in order to hold the employer liable for any tortious acts the supervisor may have committed. This issue should not have been decided on summary judgment.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
To recover for emotional distress inflicted by intentional conduct, Washington plaintiffs must plead and prove the elements of the tort of outrage. The basic elements of outrage are: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." Rice v. Janovich, 109 Wash.2d 48, 61, 742 P.2d 1230 (1987) (citations omitted). Liability exists when the conduct in question is "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975) (quoting Restatement (Second) of Torts § 46 cmt. d).
The Court of Appeals stated: "Ms. Hall insulted, threatened, annoyed, showed unkindness, and acted with a callous lack of consideration. But this is not enough. We hold that the level of incivility demonstrated here does not reach a level to support a claim of outrage." Snyder v. Med. Serv. Corp., 98 Wash.App. 315, 322, 988 P.2d 1023 (1999).
Viewing the evidence in the light most favorable to Snyder, this case is not merely about incivility, but rather involves threats, intimidation, and the assault of an employee by a supervisor. While mere insults and indignities do not support the imposition of liability, reasonable minds could differ as to whether Hall's conduct was sufficiently extreme as to constitute outrage. Therefore, the summary dismissal of Snyder's claim for intentional infliction of emotional distress should be reversed.

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
"Negligence ... is conduct which falls below the standard established by law for the protection of others against unreasonable risk. It necessarily involves a foreseeable risk, a threatened danger of injury, and conduct unreasonable in proportion to the danger." Hunsley v. Giard, 87 Wash.2d 424, 435, 553 P.2d 1096 (1976) (citing William L. Prosser, The Law of Torts § 43, at 250 (4th ed.1971)). Each of these issues is a question of fact for the jury to resolve. Id. at 437, 553 P.2d 1096.
The Hunsley court concluded "that the plaintiff who suffers mental distress has a cause of action; that is to say, the defendant *1168 has a duty to avoid the negligent infliction of mental distress." Id. at 435, 553 P.2d 1096. Even so, the court also stated that "[n]ot every act which causes harm results in legal liability." Id. at 434, 553 P.2d 1096. Some degree of emotional distress is a fact of life, and "the courts cannot guarantee a stress-free workplace." Bishop v. State, 77 Wash. App. 228, 234, 889 P.2d 959 (1995). Our courts have followed the principle that employers' handling of workplace disputes generally is not actionable:
The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all.
Id.
Nevertheless, Washington courts have recognized a claim for workplace negligent infliction of emotional distress:
[N]egligent infliction of emotional distress is a cognizable claim in the workplace when it does not arise solely from racial remarks and does not result from an employer's disciplinary acts or its response to a personality dispute.
Chea v. Men's Wearhouse, Inc., 85 Wash. App. 405, 407, 932 P.2d 1261, 971 P.2d 520 (1997), review denied, 134 Wash.2d 1002, 953 P.2d 96 (1998).[3]
Both this legal precedent and sound policy considerations dictate that an employer be held responsible when the negligent acts of its supervisor cause emotional distress to an employee and those acts exceed acceptable employee discipline or the employer's reasonable response to a personality dispute.[4]
Based on relevant Washington case law, to hold an employer liable for the negligent infliction of emotional distress by its supervisor in the workplace, an employee plaintiff must prove the following elements: (1) the supervisor acted on the employer's behalf; (2) the supervisor failed to act with reasonable care; (3) the supervisor's acts exceeded acceptable employee discipline or the employer's reasonable response to a personality dispute; (4) the supervisor's negligent acts proximately caused injury to the plaintiff; and (5) the plaintiff's emotional distress is manifested by objective symptoms.
MSC contends that the facts alleged by Snyder involve nothing more than personality conflicts and workplace disputes. However, a jury could reasonably find that Hall's verbal threats and offensive touching constitute behavior beyond acceptable discipline or the reasonable response to a personality dispute.
While MSC represented in its employee handbook that the responsibilities of its supervisors include "promoting a safe and healthy work environment," the employer allowed Hall's interactions with her subordinates to be "authoritarian, belligerent, sarcastic, demeaning, and intimidating." CP at 143, 252.
When viewed in the light most favorable to Snyder, the evidence supports assertions that Hall's abusive behavior precipitated the resignations of professional staff members under her supervision and occasioned the disability of others.[5] As a direct result of Hall's actions, Snyder claims that she suffered aggravation *1169 of her depression and PTSD symptoms. Although MSC's management received many complaints from the employees in Hall's department, the character of the long-term relationship between the supervisor and her subordinates apparently remained unchanged.
The Chea court recognized that "an employer must be accorded latitude in making decisions regarding employee discipline." 85 Wash.App. at 412, 932 P.2d 1261. Trivial inflictions of emotional distress do not support this cause of action. But when a supervisor's conduct in the workplace is serious and persistent enough to inflict severe emotional distress on an employee, that conduct may be found to be unreasonably dangerous its risks outweigh the utility of the supervisor's action. Merely rude or boorish behavior does not give rise to this cause of action, but Bishop should not be construed to protect a supervisor who allegedly assaulted an employee and threatened her life. If a supervisor's acts are found to be not in the nature of acceptable employee discipline or not a reasonable response to a personality dispute, the employer can be held liable for inflicting emotional distress on its employee. In the case before us, the characterization of Hall's acts should be within the purview of the trier of fact.
A plaintiff's negligence claim is to be tested "against the established concepts of duty, breach, proximate cause, and damage or injury." Hunsley, 87 Wash.2d at 434, 553 P.2d 1096. A restriction on the issue of liability for negligent infliction of emotional distress "is the requirement that the mental and emotional suffering, to be compensable, must be manifested by objective symptomatology." Id. at 436, 553 P.2d 1096. This Court has held that the objective symptoms requirement is satisfied if the symptoms "constitute a diagnosable emotional disorder." Hegel v. McMahon, 136 Wash.2d 122, 135, 960 P.2d 424 (1998). In the case before us, the record contains undisputed evidence that Snyder exhibited symptoms of anxiety, depression, and PTSD.
We must also consider the foreseeability of harm to the plaintiff. "[T]he plaintiff's mental distress must be the reaction of a normally constituted person, absent defendant's knowledge of some peculiar characteristic or condition of plaintiff." Hunsley, 87 Wash.2d at 436, 553 P.2d 1096. Until her meeting with Charney, Snyder did not mention her depression or diagnosis of PTSD to her employer. Therefore, Snyder may not predicate a claim for emotional distress on her undisclosed susceptibility to emotional injury
There are genuine issues of material fact as to Snyder's claim for negligent infliction of emotional distress. Therefore, the summary dismissal of this claim should be reversed.

ACCOMMODATION OF DISABILITY
Under the Washington Law Against Discrimination (WLAD), it is unlawful for an employer to discriminate against any person in the terms or conditions of employment because of a sensory, mental, or physical disability. RCW 49.60.180(3). The statutory protection from discrimination is to be liberally construed. RCW 49.60.020; Phillips v. City of Seattle, 111 Wash.2d 903, 908, 766 P.2d 1099 (1989). "An employer's failure to reasonably accommodate the sensory, mental, or physical limitations of a disabled employee constitutes discrimination unless the employer can demonstrate that such accommodation would result in an undue hardship to the employer's business." Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 639, 9 P.3d 787 (2000).
An accommodation claim presents two basic issues: (1) whether the employee was disabled within the meaning of the WLAD; and (2) whether the employer met its affirmative obligation to reasonably accommodate the disability. Id. at 640, 9 P.3d 787.
Disability
The federal cases, which the majority finds persuasive, are based upon interpretations of the Americans with Disabilities Act of 1990(ADA). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). Regulations interpreting the ADA define "major life activities" to include working. 29 C.F.R. § 1630.2(i).
*1170 To be substantially limited in the major life activity of working, the ADA requires that one be regarded as precluded from more than a particular job. "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).
However, the ADA definition differs substantially from the disability definition of the WLAD. This Court has found that the "disability" element of an accommodation claim under the WLAD is satisfied when the claimant proves "that (1) he or she has/had a sensory, mental, or physical abnormality and (2) such abnormality has/had a substantially limiting effect upon the individual's ability to perform his or her job." Pulcino, 141 Wash.2d at 641, 9 P.3d 787. Because the definition of "disability" under Washington law is considerably broader than the definition under the ADA, it is improper to apply federal precedent based on the ADA to address the meaning of disability under state law.
Snyder suffers from a diagnosed mental disorder, and her condition distinguishes her from employees who have simple personality disputes with their supervisors.[6] The WLAD prohibits MSC from discriminating against Snyder on the basis of her mental disability, just as the statute protects other workers from discrimination by employers on the basis of the employees' sensory and physical disabilities.
Snyder declared that she suffered from PTSD, a mental disability, which caused her doctor to restrict her from working under the supervisor whose conduct triggered Snyder's PTSD symptoms.[7] MSC does not dispute that Snyder suffered from the diagnosed mental condition or that her condition substantially limited her ability to perform her job. MSC presented no evidence that Snyder was not disabled under the WLAD. Thus, Snyder satisfied the "disability" element of her claim.
Reasonable Accommodation
To trigger the employer's duty to reasonably accommodate an employee's disability, the employee must give the employer notice of that disability. Goodman v. Boeing Co., 127 Wash.2d 401, 408, 899 P.2d 1265 (1995). Once an employee gives notice of a disability, as Snyder arguably did when she informed Charney that she had been diagnosed with PTSD, the burden shifts to the employer "to take `positive steps' to accommodate the employee's limitations." Id.
"Reasonable accommodation ... envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." Id. at 408-09, 899 P.2d 1265. Here, the accommodation that Snyder sought was to be assigned to a new supervisor or to be transferred to another position with MSC.
Instead of determining whether assignment to a new supervisor or transfer to another position was feasible, it appears that MSC took no action. Charney told Snyder that he wanted her to return to work, but that she would be required to report to Hall. Snyder also testified that Charney told her "there are positions within MSC that I could *1171 work and do my same job and just not report to [Hall]." CP at 36. This testimony creates a question of fact for the jury as to the reasonableness of the employer's response to Snyder's request for accommodation.
Under the WLAD, the employer has the burden of proving that a requested accommodation would cause undue hardship. "[E]mployers have an affirmative obligation to reasonably accommodate the sensory, mental, or physical limitations of such employees unless the employer can demonstrate that the accommodation would impose an undue hardship on the conduct of the employer's business." Doe v. Boeing Co., 121 Wash.2d 8, 18, 846 P.2d 531 (1993).
MSC made no showing that Snyder's proposed accommodationstransfer to another position or permission to report to a supervisor other than Hallwould create an undue hardship for the employer. The failure to produce evidence of undue hardship should preclude entry of summary judgment in the employer's favor.
Whether MSC reasonably accommodated Snyder's disability and whether Snyder's requested accommodations placed an undue burden on the employer are properly questions for the trier of fact.

CONCLUSION
Issues of material fact exist as to Snyder's claims for intentional and negligent infliction of emotional distress and for failure to accommodate her mental disability. Accepting Snyder's factual allegations as true and drawing all reasonable inferences therefrom in her favor should preclude summary judgment for the employer. The dismissal of these claims should be reversed, and the matter should be remanded for trial on the merits.
ALEXANDER, C.J., and IRELAND, JOHNSON, JJ., concur.
NOTES
[1] The terms "employer" and "supervisor" have been substituted for the archaic "master" and "servant."
[2] De Leon is cited with approval in Mason v. Kenyon Zero Storage, 71 Wash.App. 5, 12-13, 856 P.2d 410 (1993); Thompson v. Everett Clinic, 71 Wash.App. 548, 553, 860 P.2d 1054 (1993); Simmons v. United States, 805 F.2d 1363, 1369 (9th Cir.1986).
[3] The Chea court's clear articulation of the law concerning the negligent infliction of emotional distress in Washington renders the majority's discussion of this tort in other jurisdictions superfluous.
[4] The Bishop court held as follows: "[A]bsent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." Bishop v. State, 77 Wash.App. 228, 234-35, 889 P.2d 959 (1995). In articulating this holding, the Bishop court was presented with a case in which the plaintiff employee was not placed in physical peril. In addition, she did not produce evidence of any physical manifestations of her emotional distress.
[5] E.g., Gayle Andrews, an employee in the Care Management Department, stated that she "left MSC because of Celestine." Clerk's Papers (CP) at 149. Regina Pratt West, an MSC nurse case manager, took a lengthy sick leave and stated as follows: "The majority of my health problems are, I believe, directly due to the personal attacks and stressful atmosphere I was subjected to by Celestine Hall." CP at 148.
[6] The majority cites Weiler v. Household Fin. Corp., which states that "[n]ot every personal discomfort nor workplace embarrassment rises to the level of a recognized disability requiring accommodation under the law." 101 F.3d 519, 526-27 (7th Cir.1996). The statement does not apply to the instant case because Snyder has a recognized disability under the WLAD.
[7] As Amicus Curiae Washington Employment Lawyers Association notes in its brief, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994) recognizes posttraumatic stress disorder (PTSD) as an anxiety disorder. An essential feature of PTSD is "the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury.... The person's response to the event must involve intense fear, helplessness, or horror.... The characteristic symptoms resulting from the exposure to the extreme trauma include persistent reexperiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness, and persistent symptoms of increased arousal.... [T]he disturbance must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-IV at 424.