# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHRISTOPHER YOUNG, | ) | No. 73521-7-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KING COUNTY, WASHINGTON, | ) | |
| | ) | |
| Respondent. | ) | FILED: August 22, 2016 |
| | ) | |

LEACH, J. — Christopher Young appeals the trial court's summary dismissal of his claims against his employer, King County (County), and denial of his motion to amend his complaint. Young asserts that the County violated the Washington Law Against Discrimination (WLAD)[1] when it failed to address his supervisor's aggressive behavior toward Young, scrutiny of his work performance, and pursuit of discipline for him. Because Young's proposed amendment to his complaint would have been futile and would have caused undue delay, the trial court did not abuse its discretion in denying it. Because Young failed to present specific and material facts to support his claims of racial discrimination and retaliation, the trial court properly dismissed those claims. And because the County did not owe Young a duty to prevent workplace

---

[1] Ch. 49.60 RCW.

disputes, the trial court properly dismissed his negligent infliction of emotional distress claim. Accordingly, we affirm.

FACTS

Christopher Young has worked for King County's Facilities Management Division (FMD) since 2000. Young and other real property agents (RPAs) in the Real Estate Services section (RES) process permits to use county land. Young is an RPA level III and the most senior member of the group. Coworkers recognize him as experienced and knowledgeable about permitting.

Doug Williams supervised Young from 2007 to late 2012. The two had numerous conflicts. One of Williams's priorities for RES was to work through a backlog of permit applications. Young and another RPA, Aaron Halley, saw Williams as a "top down" supervisor with little experience in their area. Soon after Williams started, Young spoke with him about Young's desire to become an RPA IV. Williams declined to support a reclassification at the time but told Young he felt Young "could get there." Williams says that after that point, their relationship soured.

Young and Williams had a physical altercation at work on September 10, 2010. Young had been speaking with a coworker, Matthew Burke, when Williams interjected. Young put his hand up in Williams's direction. Williams either batted it away or grabbed it and put it on the counter. Young reported the

incident as an assault and, in two written statements, blamed Williams's aggression. He did not allege that racism motivated Williams. Both Young and Williams received written reprimands for disorderly conduct.

Williams saw Young's conduct at work as a problem. This led him to seek investigations or discipline three times. In early 2011, he sought and obtained a written reprimand for Young's violations of the FMD attendance policy. Young and other RPAs are exempt employees under the Fair Labor Standards Act of 1938 (FLSA)[2] and so are allowed to maintain somewhat flexible work schedules. They still commit to eight-hour schedules. FMD managers issue reprimands and propose suspensions for employees who repeatedly depart from their schedules. Also in 2011, Williams sought advice from human resources (HR) managers when he suspected Young had closed outstanding permits without following the correct procedure. No investigation resulted from that complaint. And later that year, Williams complained to management that Young was insubordinate in failing to follow the correct steps in processing back payments on a permit. HR investigated but did not impose any discipline on Young.

In addition to Williams, Young's coworkers also urged FMD managers to examine Young's conduct. Halley complained to manager Steve Salyer in 2009 about Young's disruptive conduct. Wendy Siao complained in 2009 that Young

---

[2] 29 U.S.C. §§ 201-219.

was creating "'an unsafe work environment'" in being rude and bullying toward her and Williams. An employee in a different work unit complained in 2013 that Young and another RPA, Alex Perlman, were "unprofessional and inappropriate" in shouting at each other during a meeting. And Burke complained in 2013 about Young's "strange behavior" and that he was "moving towards office violence once again."

Halley also complained repeatedly to Williams that Young violated FMD attendance policies. Without Williams's or management's knowledge, Halley kept a log of Young's behavior from 2008 to 2009. He purported to document late arrivals, early departures, long breaks, and personal phone calls and Internet use at work. Williams instructed Halley to "keep[ ] his opinions to himself" about Young. From 2010 to 2011, Williams kept his own log of Young's attendance and behavior, which he forwarded to his manager, Salyer.

Young, in turn, complained about Williams throughout their time working together. Until 2012, Young's complaints centered on his beliefs that Williams was incompetent and did not tolerate disagreement. Young asserted that Williams scrutinized his conduct more closely than other employees' conduct, e-mailed him frequently with "conflicting unrealistic expectations," and worked collaboratively with Burke and Perlman while taking a "top down" approach with Young. Young also pointed to a suggestion Williams made early on that Young

-4-

"did not have the 'education' or 'skill level' to do the permitting work." And he asserted that Williams assigned work from him and another RES employee, Dorothy Bolar, to Burke and Perlman.

Halley observed that Williams did not assign Young to train new staff; instead, Halley and Bolar were responsible for training staff hired after them. Williams was involved in hiring three Caucasian employees: Burke and Perlman as RPA IIs and a former employee, Carol Thompson, for a temporary position.[3] He also helped Halley move from RPA II to RPA III. Williams, Halley, Bolar, and Young are African American. Siao is Asian American. Burke and Perlman are Caucasian.

In March 2012, Young and Williams had a heated argument during a training session in Young's cubicle. When Young got up to leave, Williams tried to continue the argument and partly blocked Young's exit. Young left anyway, and Williams followed him. Both were speaking loudly. Williams then reengaged Young when Young returned an hour later. Management investigated the incident and proposed suspensions for both men. In May 2012, Salyer reminded Young that emotional outbursts and accusations during meetings were "unacceptable," as was repeatedly seeking help directly from HR rather than through his chain of supervision. At a predisciplinary meeting in June 2012,

---

[3] Williams invited Young, among other employees, to participate in hiring for an RPA III position in 2009.

Young's union suggested that race may have been a motivating factor in Williams's behavior toward Young. Ultimately, due to procedural concerns, the County did not impose discipline on Young or Williams.

The June 2012 meeting was the first time Young or his representative raised a racial discrimination claim. Young stated in his deposition that he did not attribute Williams's conduct to Young's race until that time. HR managers tried to investigate the discrimination claim, requesting more information by e-mail and meeting with Young and his attorney. Young provided no more information at the time. At a meeting with HR the next month, Young's attorney asked for disability accommodations but did not mention discrimination. Though Young said he had information to support his discrimination claim, he did not follow up with any. HR again attempted to investigate the discrimination claim in March 2013, but Young did not cooperate. When Williams first learned about the racism complaint in March 2013, he no longer supervised Young.

Young filed a lawsuit against the County in September 2013, seeking relief on five theories: racial discrimination, retaliation, assault, and negligent and intentional infliction of emotional distress. He moved to amend his complaint after discovery ended and shortly before the County filed its summary judgment motion. The proposed amended complaint added a hostile work environment claim. It newly alleged that Halley engaged in "violent and or abusive conduct"

and the County ratified that conduct. And it newly alleged that Young's workers' compensation claim motivated Williams's conduct against him and that FMD managers "condoned" both Williams's and Halley's actions. The trial court denied Young's motion to amend his complaint.

The trial court granted the County's motion for summary judgment as to Young's claims of discrimination, retaliation, assault, and intentional infliction of emotional distress. And the court granted the County's motion to dismiss Young's remaining negligent infliction of emotional distress claim for lack of jurisdiction. Young appeals.

## STANDARD OF REVIEW

This court reviews a summary judgment decision de novo, considering the record before the trial court in the light most favorable to the nonmoving party.[4] Summary judgment is appropriate only when there is no genuine issue as to any material fact.[5] "Summary judgment in favor of the employer in a discrimination case is often inappropriate because the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination" that a jury must resolve.[6] But "a plaintiff in a discrimination

---

[4] Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014).

[5] CR 56(c); Camicia, 179 Wn.2d at 693.

[6] Davis v. W. One Auto. Grp., 140 Wn. App. 449, 456, 166 P.3d 807 (2007).

-7-

case must establish specific and material facts to support each element of a prima facie case."[7]

This court reviews a trial court's denial of a motion to amend for manifest abuse of discretion.[8]

ANALYSIS

Motion To Amend

Young first contends that the trial court abused its discretion when it denied his motion to amend his complaint.

A trial court shall freely grant a party leave to amend "when justice so requires."[9] A trial court abuses its discretion if it denies leave to amend without explaining its reasons unless those reasons are "apparent in light of the circumstances shown in the record."[10] These reasons may include futility, undue prejudice, and undue delay.[11]

Here, the trial court did not explain its ruling. But the record shows that Young's proposed amendment was futile, that denying Young's motion did not prejudice him, and that the amendment would have caused undue delay.

---

[7] Davis, 140 Wn. App. at 456.

[8] Herron v. Tribune Pub. Co., 108 Wn.2d 162, 165, 736 P.2d 249 (1987).

[9] CR 15(a); Rodriguez v. Loudeye Corp., 144 Wn. App. 709, 729, 189 P.3d 168 (2008).

[10] Donald B. Murphy Contractors, Inc. v. King County, 112 Wn. App. 192, 199, 49 P.3d 912 (2002).

[11] Rodriguez, 144 Wn. App. at 729; Donald B. Murphy Contractors, 112 Wn. App. at 199.

-8-

The requested amendment added an express hostile work environment claim. But Young acknowledges that he and the County actually litigated the hostile work environment issue, and the record shows that the trial court focused on that issue before dismissing it. Thus, adding an express assertion of that claim to the complaint would be futile.

Adding the revised factual allegations in Young's amended complaint would also be futile. Young made these allegations after the discovery cutoff, but they described only events that occurred before he filed his original complaint.[12] Young sought to add allegations that Halley discriminated against him, but Halley's alleged acts took place, and Young found out about them, before Young filed the original complaint. Thus, any further delay from Young's proposed amendment, including interviewing newly named witnesses, would have been undue. The trial court was justified in denying Young's motion.[13]

Disparate Treatment

Next, Young challenges the trial court's dismissal of his disparate treatment claim. He contends that he presented sufficient evidence to show a

---

[12] The amended complaint does not mention the investigation of Young that the County began after Young filed the original complaint.

[13] The new allegations that Young sought to include would be futile for the additional reason that they contradict the discovery evidence. Some contradicted statements in Young's deposition, e.g., that Young did not believe race to motivate Halley. Others contradicted other, undisputed evidence, e.g., that Halley did not act at management's direction and, instead, Williams discouraged his surveillance of Young.

prima facie case for disparate treatment and evidence that the County's explanations were pretextual.

To make a prima facie case of disparate treatment, Young must show he is part of a protected class; the County treated him less favorably in the terms or conditions of his employment than a similarly situated, nonprotected employee; and he and that comparator were doing substantially the same work.[14]

If Young presents this prima facie case, the burden shifts to the County to show legitimate, nondiscriminatory reasons for its adverse employment action.[15] If the County produces this evidence, the burden shifts back to Young to show that the County's reasons are pretextual. One way he can do so is by "proving that discrimination was a substantially motivating factor in the employment decision."[16]

Young failed to meet this burden at summary judgment. He did not present sufficient evidence to establish a prima facie case or show pretext. The parties do not dispute that as an African American, Young belongs to a protected class. We also assume, for our analysis, that Young was doing substantially the

---

[14] RCW 49.60.180; Domingo v. Boeing Emps.' Credit Union, 124 Wn. App. 71, 86-88, 98 P.3d 1222 (2004). The elements of a prima facie disparate treatment case are not absolute but vary based on the relevant facts. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 362-63, 753 P.2d 517 (1988).

[15] Kirby v. City of Tacoma, 124 Wn. App. 454, 464, 98 P.3d 827 (2004).

[16] Scrivener v. Clark Coll., 181 Wn.2d 439, 447, 334 P.3d 541 (2014).

same work as two Caucasian coworkers, Matthew Burke and Alex Perlman, who were also RPA IIIs.

But Young has not "establish[ed] specific and material facts to support" that he was treated less favorably than similarly situated Caucasian coworkers.[17] Specifically, he presented no evidence for his claim that Burke and Perlman were similarly situated. The County presented abundant evidence that Young violated department attendance policies and policies about using county resources for personal matters. Young did not provide any evidence that his comparators behaved similarly. Instead, Young offered broad assertions about unspecified other employees at RES: that Williams "had concerns regarding alleged 'misconduct'" by a Caucasian employee, that "RES employees often use County equipment or phones for personal reasons," and that "[t]here was a past practice in RES permitting exempt employees to set their own schedules."[18] These observations are not evidence that Burke or Perlman engaged in conduct similar to Young's. Nor are they evidence that if Burke or Perlman did engage in this conduct, they did not receive discipline similar to Young's. Young attempts to

_____

[17] See Domingo, 124 Wn. App. at 77-78.
[18] Young offers the declaration of a coworker, Carolyn Mock, who states that she had observed Halley visiting Facebook, watching videos, and making personal phone calls. Like Young, Halley is African American. As a member of the same protected class as Young, he is not a valid comparator. See Domingo, 124 Wn. App. at 87.

-11-

place the burden of showing this element on the County.[19]  But this showing is part of Young's prima facie case:  he needed to present "specific and material facts," and he did not.[20]

Young does not dispute that the County offered legitimate reasons for reprimanding him and scrutinizing his attendance record.  These include Young's disorderly conduct during the September 2010 incident; his consistent noncompliance with FMD's attendance policy; and complaints by peers Halley, Burke, and Siao, and an employee outside the unit.  Young acknowledged it would be appropriate for Williams to look into these complaints.

Instead, Young contends that the County's reasons are a pretext for its action.  In his deposition, Young asserted that Williams discriminates against other African Americans to curry favor with Caucasian coworkers and supervisors.  Young may hold this opinion, but that opinion is not evidence.  He does not point to any "specific and material facts" indicating that his race

---

[19] The County indeed introduced the only evidence of disciplinary comparators.  It presented evidence of numerous other employees in FMD— though not the same division or section as Young—being disciplined similarly or more harshly.

[20] Coworker Dorothy Bolar's declaration suffers from the same vagueness as Young's other purported evidence:  Bolar "viewed [Young] as professional in his tone, says she "cannot imagine anyone viewing Mr. Young as aggressive or violent," and did not see Young as neglecting his duties.  Likewise, a letter from the FMD director noting that some employees had perceived "that FLSA exempt employees do not consistently abide by regular work schedules" says nothing about whether Burke and Perlman were among the noncompliant employees or whether their noncompliance resembled Young's.

motivated Williams. And the totality of the circumstances does not support that claim. Young did not mention race as a motivating factor in his contemporaneous statements, did not present any evidence of this when HR met with him in 2012 to gather evidence of bias or retaliation, and did not cooperate when the County again tried to investigate in 2013. Young offered no evidence that Williams discriminated in hiring: as Young acknowledged, he has no knowledge about hiring and he did not seek this information in discovery. The County offers valid, nondiscriminatory explanations for Williams's supporting role in hiring. Standing alone, Young's statements in his deposition that he told managers before 2012 that Williams "had a problem with his own race" and that Williams valued Caucasian coworkers' input over Young's does not create an issue of material fact about pretext. The trial court did not err in dismissing Young's disparate treatment claim.

Hostile Work Environment

Young also challenges the trial court's dismissal of his discrimination claim. He claims that he showed that he was subject to a hostile work environment.

To establish a hostile work environment based on race, Young must present evidence that he was subject to unwelcome harassment, the harassment was due to his race, the harassment affected the terms and conditions of his

employment, and the harassment was imputable to the County.[21] Young asserts that he made such a prima facie case. He also asks this court to recognize a new cause of action for "hostile work environment due to retaliation." In effect, he proposes that this court substitute harassment due to retaliation for the second element above. We decline to do so here, and we conclude that Young's hostile work environment claim would fail under either theory.

We accept, for our analysis, Young's assertion that a jury could infer he was subject to unwelcome harassment. A hostile work environment does not require a series of discrete adverse actions.[22] Young presented evidence of at least two acts of physical aggression that would amount to intimidation and, in one case, assault. We further assume that a jury could find this conduct sufficiently severe or pervasive to affect Young's conditions of employment. The County's investigations, on the other hand, were neither harassment nor sufficient to alter Young's workplace. Young's peers or Young himself instigated many of those investigations. The investigations resulted in only minimal discipline. And Young agreed at his deposition that their subject matter was appropriate.

---

[21] Davis v. Fred's Appliance, Inc., 171 Wn. App. 348, 359, 287 P.3d 51 (2012).
[22] See Adams v. Able Bldg. Supply, Inc., 114 Wn. App. 291, 297, 57 P.3d 280 (2002).

We also assume that Young has shown an issue of fact about the adequacy of the County's corrective action with respect to Williams's conduct. An employer has a duty to take prompt and appropriate action when it knows or should know of harassment.[23] Since Williams's aggressive conduct recurred with the County's knowledge over a period of years, Young created an issue as to whether that conduct was imputable to the County.

But Young fails to show the motivation necessary for a hostile work environment. We do not need to consider adopting a new theory of hostile work environment based on retaliation in this case because Young offers no evidence that his asserted protected conduct motivated the alleged harassment. Nor has he shown any evidence that his race motivated that harassment. He cites no support for his assertions that his reports to HR were "viewed as disruptive and unacceptable" and "that rather than meaningfully investigating the racially charged treatment at the time he made his initial complaints . . . , the County's decision makers viewed him as the cause of the conflict." Instead, the record points toward the opposite conclusion. It shows that FMD managers tried to investigate Young's claims several times, with limited or no cooperation from Young.

---

[23] Domingo, 124 Wn. App. at 85 n.32.

-15-

Even if the County did not adequately respond to his complaints, Young still did not create a reasonable inference that his race or protected conduct motivated Williams's actions. The e-mails from Williams that Young forwarded to his union representative, describing them as "abuse," show at most an intrusive management style; they do not hint at an improper motive. Nor has Young presented any evidence that Williams knew of Young's complaints and was thus capable of intending to retaliate. Young's theories about Williams's attitudes toward other African Americans are no substitute for evidence at summary judgment; nor are Young's theories about the way FMD managers viewed him. Because Young presented no evidence of a racial or retaliatory motive, we affirm the dismissal of his hostile work environment claim.

Retaliation

Young also contends that the trial court erred in dismissing his retaliation claim.

To establish a prima facie case of retaliation, Young must show that he engaged in statutorily protected activity, that he suffered an adverse employment action, and that his protected activity caused the County to take the adverse action.[24] To show this causal link, Young must show that retaliation was a

---

[24] RCW 49.60.210(1); Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014), review denied, 182 Wn.2d 1006 (2015).

substantial factor in the County's actions—requiring that the decision-maker knew about the protected activity.[25]

Young contends that his reports to management about Williams's conduct were protected activity. He further contends that he created an issue of fact as to whether Williams took adverse actions against him through "a combination of reprimands, investigations and physical and non-physical conduct." He alleges this "pattern of hostility" continued as Young complained about Williams. If Young succeeds in making this prima facie case, he must also present evidence that the County's legitimate reasons for its actions were pretextual.[26] We reject Young's retaliation claim because Young did not present evidence that Williams or others at the County took adverse actions against him because of protected activity.

First, Young alleged no adverse actions that occurred after Williams learned of protected activity. A general complaint about an employer's actions is not protected conduct under the WLAD without some reference to the plaintiff's protected status.[27] Young presented no evidence that he made a discrimination

---

[25] See Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 862, 991 P.2d 1182 (2000).

[26] Currier, 182 Wn. App. at 743.

[27] Alonso v. Qwest Commc'ns Co., 178 Wn. App. 734, 753-54, 315 P.3d 610 (2013).

complaint before June 2012.[28] Therefore, Young cannot base a retaliation claim on any actions taken before then. Young also presented no evidence that Williams learned about Young's racism complaints before 2013, when he was no longer supervising Young. Thus, nearly all of Williams's requests for discipline or investigations, along with instances of his aggressive conduct, preceded Young's asserted protected activity. The lone exception is an October 2012 incident in which Williams grabbed papers from Young's hand while Young was at the copy machine. That incident alone is not an adverse employment action and so cannot support a retaliation claim.[29]

Second, none of the conduct Young complains about is an adverse employment action. Young does not allege he was ever denied compensation. The most severe action the County took against Young was to threaten suspension, but that cannot support a retaliation claim as it came before Young's protected activity. Moreover, the County withdrew that proposal, and a mere threat of discipline is not an adverse employment action.[30] And while the paper-grabbing incident did occur after Young alleged racial discrimination, that incident

---

[28] Young stated in his deposition that he told several managers before 2012 that Williams "had a problem with his own race." Young declined to offer further details or conduct discovery about these reports. Nor did he offer evidence that Williams knew about them.

[29] Washington v. Boeing Co., 105 Wn. App. 1, 10, 19 P.3d 1041 (2000) (noting that "[c]asual, isolated or trivial manifestations of a discriminatory environment" do not violate the law).

[30] Kirby, 124 Wn. App. at 465.

alone cannot support Young's allegation of a "pattern of harassment." This incident would not dissuade a reasonable employee from charging discrimination.[31] We therefore affirm the dismissal of Young's retaliation claim.

### Negligent Infliction of Emotional Distress

Finally, Young contends that the trial court erred in dismissing his negligent infliction of emotional distress (NIED) claim.

This court may affirm on any basis the record supports.[32] Because we hold that the County did not owe Young a duty to prevent the acts he alleges, we decline to decide whether the Industrial Insurance Act[33] barred Young's NIED claim and whether that claim duplicated his discrimination claims.

We test a plaintiff's NIED claim "'against the established concepts of duty, breach, proximate cause, and damage or injury.'"[34] The existence of a duty is a question of law.[35] An employer has a duty "to provide all employees a reasonably safe place to work."[36] But "'absent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to

---

[31] See Boyd v. State, 187 Wn. App. 1, 13, 349 P.3d 864 (2015).

[32] Hadley v. Cowan, 60 Wn. App. 433, 444, 804 P.2d 1271 (1991).

[33] Title 51 RCW.

[34] Snyder v. Med. Serv. Corp. of E. Wash., 145 Wn.2d 233, 243, 35 P.3d 1158 (2001) (quoting Hunsley v. Giard, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976)).

[35] Snyder, 145 Wn.2d at 243.

[36] McCarthy v. Dep't of Soc. & Health Servs., 110 Wn.2d 812, 818-19, 759 P.2d 351 (1988) (finding a duty to provide a workplace reasonably free from tobacco smoke).

-19-

avoid the inadvertent infliction of emotional distress when responding to workplace disputes.'"[37]

The County did not owe Young a duty to prevent the incidents that Young alleges harmed him. The Supreme Court has excluded from separate NIED claims the type of workplace conflicts that Young points to as aggressive and stressful: an incident where Young abruptly left a training exercise, one where Williams grabbed papers from Young when Young was at the copier, and management's alleged ratification of Halley's surveillance of Young. [38]

Young casts his allegations about Williams as "non-work related," but he does not support that description. He presented no evidence that Williams's conduct extended beyond workplace matters like the supervisor's conduct in Strong v. Terrell,[39] on which he relies. There, the supervisor mocked the plaintiff's hair color, her house, her husband's employment, and her role as a mother; spit in her face while screaming at her; and disconnected the telephone when she worked the night shift.[40] In contrast, each instance of aggression Young cites arose directly from, and was limited to, workplace matters.[41]

---

[37] Snyder, 145 Wn.2d at 244 (quoting Bishop v. State, 77 Wn. App. 228, 234-35, 889 P.2d 959 (1995)).
[38] See Snyder, 145 Wn.2d at 243-44.
[39] 147 Wn. App. 376, 195 P.3d 977 (2008).
[40] Strong, 147 Wn. App. at 388-89.
[41] The October 2012 incident apparently stemmed from a dispute over whose papers were in the copy machine. The September 2010 incident began when Williams interjected in Young and Burke's conversation about permit

"'[E]mployers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all.'"[42] The County had no duty to provide Young "with a stress free workplace."[43]

In asserting his NIED claim, Young contends the County should have treated him differently, particularly by limiting his interaction with Williams, because it knew he had received diagnoses of anxiety, panic attacks, and PTSD (posttraumatic stress disorder). The appropriate cause of action in that case would be for failure to accommodate a disability.[44] But Young did not plead or argue such a claim, and we do not speculate whether that claim would have succeeded.

We affirm the dismissal of Young's NIED claim.

---

processing. Young does not allege that Williams made comments that went beyond workplace matters on these occasions or any other.

[42] Snyder, 145 Wn.2d at 245 (quoting Bishop, 77 Wn. App. at 234). Although Young likens his case to the plaintiff's in Chea v. Men's Wearhouse, Inc., 85 Wn. App. 405, 412, 932 P.2d 1261 (1997), the Supreme Court limited Chea to its facts. It held that this court was correct in affirming the verdict in Chea only because the employer did not argue the issue of duty. Snyder, 145 Wn.2d at 245-46. Since the County raised the duty issue at the trial level, Chea does not aid Young here.

[43] Snyder, 145 Wn.2d at 243.

[44] See Sommer v. Dep't of Soc. & Health Servs., 104 Wn. App. 160, 172, 15 P.3d 664 (2001).

## CONCLUSION

Because Young fails to present evidence sufficient to avoid summary judgment on any claim and the trial court did not abuse its discretion in denying his motion to amend the complaint, we affirm.

_Leach, J._

WE CONCUR:

_Schindler, J_                    _Becker, J._